In re Tiffany IVORY, Debtor.

Tiffany Ivory, Plaintiff,

v.

United States of America, United States Department of Education, Defendants.

Bankruptcy No. 99–05996–BGC–7.
Adversary No. 00–00014.

United States Bankruptcy Court,
N.D. Alabama,
Southern Division.

Oct. 29, 2001.

Kenneth J. Lay, Birmingham, AL, for the plaintiff-debtor.

Leon F. Kelly, Assistant United States Attorney, Birmingham, AL, for defendant.

## MEMORANDUM OPINION ON COMPLAINT TO DISCHARGE STUDENT LOAN

BENJAMIN COHEN, Bankruptcy Judge.

### I. Background

The debtor borrowed $2,500 in 1985 to attend a vocational school. She has not paid that loan and seeks to discharge it in the pending Chapter 7 case. Pursuant to section 523(a)(8) of the Bankruptcy Code, her loan is not dischargeable unless she can prove that paying the debt will impose an undue hardship on her and her dependents.[1]

The specific matter before the Court is the debtor's *Complaint to Discharge Stu-*

---

1. Section 523(a)(8) reads:

 (a) A discharge under section 727 [of the Bankruptcy Code, 11 U.S.C. § 727] ... does not discharge an individual debtor from any debt—

 (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or non-profit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

 11 U.S.C. § 523(a)(8) (parenthetical added).

*dent Loan* filed on January 18, 2000. A trial was held on May 15, 2001. The debtor and her attorney Kenneth J. Lay appeared, along with Leon F. Kelly, Assistant United States Attorney, for the defendants. The matter was submitted on the debtor's testimony, exhibits, stipulations, arguments, briefs, and the Court's records. With the defendants' consent, the debtor filed an affidavit on August 29, 2001, supplementing the trial record.

## II. Issues

■ A student loan debt is not dischargeable in bankruptcy unless, "excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). Consequently, in proceedings to determine the dischargeability of a student loan, there are two issues: (1) is there a debt; and (2) if there is, would paying that debt impose an undue hardship on the debtor and the debtor's dependents.

## III. Legal Standards

### A. Burdens of Proof

■ The creditor opposing dischargeability of a student loan debt has the initial burden of proving the existence of the debt. The creditor must prove that there is a debt and that the debt is for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution. If the creditor meets that burden, the burden shifts to the debtor to prove undue hardship.

In this case, because Ms. Ivory stipulated that she owes a student loan debt to the United States Department of Education (USDE), the defendants satisfied their burden.[2] Therefore at trial, the burden shifted to the debtor to prove that paying the debt would impose an undue hardship on her and her dependents.

### B. Undue Hardship

To determine whether payment of a student loan will impose an undue hardship on a debtor, this Court has adopted the three-part test from *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395, 396 (2nd Cir.1987). See *Halverson v. Pennsylvania Higher Education Assistance Agency (In re Halverson)*, 189 B.R. 840, 844 (Bankr.N.D.Ala.1995); *O'Flaherty v. Nellie Mae, Inc. (In re O'Flaherty)*, 204 B.R. 793, 796 (Bankr.N.D.Ala.1997); and *In re White*, 243 B.R. 498, 507 (Bankr. N.D.Ala.1999) *reh'g denied* 243 B.R. 515 (Bankr.N.D.Ala.1999).[3]

■ Under *Brunner*, the debtor must prove: (1) that she cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loan; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and, (3) that she has made a good faith effort to repay the loan.

## IV. Findings of Fact

Ms. Ivory filed the pending Chapter 7 case on October 13, 1999. She filed the pending complaint on January 19, 2000.

---

**2.** The USDE filed a claim in this Chapter 7 asset case for $2,565.24. It has been paid $767.96. The stipulated balance is $1,797.28.

**3.** The Court of Appeals for the Eleventh Circuit has not addressed this issue and thus has neither developed its own test nor adopted one of another court. See *In re Mallinckrodt*, 260 B.R. 892, 899 (Bankr.S.D.Fla.2001) and *In re Roe*, 226 B.R. 258, 269 n. 50 (Bankr. N.D.Ala.1998).

## A. Student Loan

Ms. Ivory received a $2,500 student loan in 1985 when she was 18 years old; she is now 34. With her student loan, Ms. Ivory enrolled in Barclay College to become a legal assistant. After attending the school for about three months, she took a leave of absence. According to Ms. Ivory, during that absence the school lost its accreditation and closed.[4] Ms. Ivory did not complete her course of study anywhere else and has never worked as a legal assistant.

The USDE filed a claim in this case for $2,565.24 on May 9, 2000. It has been paid $767.96. And notwithstanding her complaint to determine dischargeability, Ms. Ivory did stipulate that she still owes a balance of $1,797.28.

## B. Her Children

Ms. Ivory is a single mother supporting a 15 year old son and twin, eight year old boys. Ms. Ivory testified that the older boy's father is, or was, in prison serving a seven-year sentence for violence committed against Ms. Ivory. She thinks the twins' father is in Sacramento, California.

### 1. Child Support

Ms. Ivory does not receive child support from her children's fathers.[5] She has attempted to collect child support from both fathers but has not been successful.[6] She has applied for assistance from the Alabama Department of Human Resources, but as of the time of trial, she had not

been contacted. She has discussed the matter with several private attorneys but explained that she cannot afford the about eleven hundred to fifteen hundred dollar retainer each requested or the hourly fees quoted. Ms. Ivory testified, "And if I had that money, I really don't think I would need child support." *Transcript* at 13.

### 2. The Children's Health Problems

All three children have health problems. The older son has had behavioral problems since he was about four or five. Ms. Ivory testified that this son's father was an extremely violent person and she attributes this child's problems to the turbulent domestic situation caused by that violence.

The twins were born three and a half months premature and weighed two pounds, three and a half ounces. Both have multiple health problems. Both have chronic reflux, asthma, and each uses a breathing machine. Their intestines were not fully developed at birth resulting in the intestinal reflux. They have heart problems, caused, according to Ms. Ivory, from the administration of an improper medication given for the intestinal reflux. They take medications daily and because of their breathing problems, receive daily "nebulizer treatments." *Transcript* at 22.

Because of their medical conditions, the twins receive a total of $960 per month in social security disability benefits.

---

4. According to Ms. Ivory, the school lost its accreditation because its administrators sought out financially disadvantaged people, (at welfare or unemployment offices), solicited enrollment, and encouraged those individuals to apply for student loans. Ms. Ivory represented that she first learned about *her* student loan while in class. She testified that a school administrator gave her a piece of paper and told her to sign it. She later discovered it was a student loan. Ms. Ivory was 18 at the time.

5. In its brief, the government stresses that Ms. Ivory's children have different fathers and that she was never married to either. As discussed below, the government argues that Ms. Ivory should not have had these children because in doing so she was certain to impede her ability to pay her student loan debt.

6. Ms. Ivory testified, "I don't receive a thing, not a dollar, not a call, not one thing." *Transcript* at 12.

### 3. The Children's Education

Ms. Ivory's oldest son attends public school.

The twins attend Our Lady of Fatima, a private school. Half of their tuition is paid through the Alabama Scholarship Fund, a state supported assistance program designed for low income families. Ms. Ivory attempts to pay the other half, and the twins' after school daycare, from the twins' social security benefits.[7]

Attendance at a private school provides the twins with incalculable benefits. Because of their medical problems, the twins are considered special needs children at school. According to Ms. Ivory, that recognition entitles them to assistance that would not be provided by a public school. For example, because the twins' "nebulizer treatments" and medications must be administered while the twins are at school, placement in a private school allows for assistance with these tasks. In contrast, according to Ms. Ivory, the public schools require a parent or grandparent to come to the school to administer such treatments and medication. She testified that neither she nor her mother could do that on a daily basis.

Unfortunately, Ms. Ivory is in arrears on the twins' tuition payments. Consequently, the twins are in jeopardy of losing their scholarships. If they do, they (and Ms. Ivory), will lose the benefits described above.

### C. Ms. Ivory's Health Problems

Ms. Ivory also has medical problems, some similar to her twins'. Ms. Ivory has asthma and systemic lupus.

Ms. Ivory's breathing problems began when she was about fourteen. When she was pregnant with the twins, those problems became acute. She took prescribed medication, but the problems worsened. Ms. Ivory became more ill. While in the hospital, she saw a television commercial about the medication she was taking. She discussed the medication with her doctor, who determined that it indeed attributed to her breathing problems. According to Ms. Ivory, the medication may have been defective and may have caused some deaths.

Ms. Ivory discontinued the medication, but her lungs had already been damaged. About three months before the twins were due, Ms. Ivory had a severe asthma attack. That attack attributed to the twins' premature birth.

While the twins were in intensive care, they received the same breathing medication. Ms. Ivory eventually became a plaintiff in a class action against the medication's manufacturer. After an out-of-court settlement, Ms. Ivory received remuneration for herself and the twins. Her portion of the settlement was paid to the Chapter 7 trustee in this case. The trustee distributed those funds to unsecured creditors, including the USDE which received $767.96 on its $2,565.24 claim. The twins received their full settlement.

### D. Public Assistance

Ms. Ivory previously received social security disability benefits because of her *own* medical problems. However, because those payments were not sufficient and because she wanted to work, Ms. Ivory sought employment. When she found a job, she gave up the assistance. She explained, "Yeah, because I decided that I am only thirty-four years old and I don't

---

7. Ms. Ivory testified that the school tuition is $500 per month. *Transcript* at 20. After school daycare is about $200 per month after a twenty-five dollar per week, per child dis-count. *Transcript* at 19. As stated above, the twins receive $960 total per month in social security disability benefits. *Transcript* at 16.

want to sit on my butt all through my life, you know. Five hundred dollars a month is not anything." *Transcript* at 36.

Ms. Ivory is working now despite her health problems. Consequently, other than the school scholarships, the only public assistance she receives is the twins' $960 a month social security benefits; however, she is concerned. Considering her past and present circumstances, Ms. Ivory questioned whether she made the right decision regarding public assistance. "Maybe I should have stayed on it," she testified at trial. *Transcript,* page 37. "I am afraid that I may have to go back on disability due to my inability to keep a job because of health problems," she explained in her affidavit. *Affidavit of Tiffany Ivory,* filed August 29, 2001, Proceeding No. 28 in Adversary Proceeding No. 00–00014.

### E. Employment and Income

When Ms. Ivory filed her bankruptcy case in October 1999 she was working at Children's Hospital in Birmingham, Alabama. She had surgery in the Spring of 2000. In May 2000 she was allowed six weeks medical leave without pay. When she returned to work in July 2000, she was informed that her job had been eliminated.

Ms. Ivory remained unemployed for about six months. In January 2001, she found a job as a medical biller at another hospital, Medical Center East. She was employed there at the time of the trial of this matter. Her gross, pre-tax monthly paycheck was $1,567.00.

Ms. Ivory lost her Medical Center East job after a post-trial hospitalization but recently obtained employment with Franklin Collection Service. Unfortunately, this job is also in jeopardy. In her affidavit,

Ms. Ivory testified, "I may also lose this job due to my health problems because I have already had to miss several days." *Id.*

Ms. Ivory is currently paid $8.50 per hour. Health insurance is not available.

### F. Earned Income Tax Credit and Tax Refunds

Ms. Ivory ordinarily receives an earned income credit on her federal income taxes and has, for the past two or three years, received an income tax refund. However, each of those refunds was seized by the Social Security Administration to recoup an overpayment of $8,000. Before she moved to Birmingham, Ms. Ivory received the personal social security disability benefits described above. When she advised the Social Security Administration that she was working and sent them her pay records, the Administration informed her that because of that income, her benefits, and the twins' benefits, she had been overpaid.[8]

### G. Transportation

Ms. Ivory owns a 1989 Pontiac Safari station wagon. When it runs, it is not reliable. Ms. Ivory represented that when coming to the trial of this matter, (after taking her children to school), that car broke down on the interstate. She walked to her mother's house. From there she walked to the nearest bus stop and caught the bus.

Ms. Ivory explained that her lack of reliable transportation was particularly critical at the time of the trial because she was in a six month probation period on her new job. A condition of that probation was that she not miss any work during that period.[9]

---

8. Ms. Ivory testified that she forgot to appeal that ruling.

9. Ms. Ivory testified that she had already missed work to care for her oldest son who was injured in a sporting accident. And of course, she also missed work to attend the trial of this matter.

Clearly, Ms. Ivory must have reliable transportation if she is to remain gainfully employed. Equally clear however, is that Ms. Ivory does not have sufficient income either to purchase a vehicle or to maintain the one she has. Ms. Ivory could rely on public transportation but she did testify that the regular bus trip from her house to Medical Center East, after leaving her children at school, was about two and a half hours.[10]

## H. "Current" Expenses

Ms. Ivory lists monthly expenses of $2,502 in Schedule J of her bankruptcy petition. Those expenses include: rent $600; electricity and natural gas $160; water and sewer $45; telephone service $75; food $450; clothing $200; laundry and dry cleaning $80; medical and dental expenses $185; transportation related expenses (not including car payment) $120; recreation $50; charitable contributions $100; life insurance $67; automobile installment payment $150; and the twins' school tuition $220.

Since she filed her petition, most of those expenses have increased. And she is in arrears on some of them. In the Winter of 2000, Ms. Ivory's natural gas bill averaged over $500 a month. Electricity is about $77 a month now. Water is about $92.[11] Telephone service is $100 (including an internet provider.)[12] Gasoline for her car is about $50 a week.

## I. Housing

At the time of trial, Ms. Ivory and her children rented a house for $600 a month. She was however, paying her landlord $800 a month, which included $200 toward rent arrears. That arrears occurred when she was unemployed for the six months prior to her employment at Medical Center East.

When Ms. Ivory lost her job at Medical Center East, she again defaulted on her rent. She and her children were eventually evicted.

Ms. Ivory's current rent is $325 per month. That amount is of course substantially less than her last; however, because of the eviction and move, Ms. Ivory incurred moving expenses. She is also being sued by her prior landlord for $6,200 in unpaid rent.

## J. Family Assistance

Ms. Ivory does not, and cannot, expect any assistance from her family. Her mother (who attended the trial), receives a widower's pension, has diabetes, and lives alone.[13] Her brother is in prison serving a life sentence and her sister is disabled and has four children.

## K. Payments on the Student Loan

Ms. Ivory thinks that she tried to make twenty-five dollar payments on the student loan.

## L. Post-trial Conditions

Ms. Ivory testified at trial, "I hate looking in the future because I am always getting disappointed." *Transcript* at 35. The affidavit she filed on August 29, 2001, explains that pessimism. The affidavit reads:

> that the children need the computer and accompanying internet service and contends that the children's grades have improved with that assistance.

---

10. There is no evidence about current travel times.

11. She has called and complained because she believes her usage is less.

12. Ms. Ivory is also paying for a computer. Her mother signed the note. Ms. Ivory pays half. Her mother pays half. The total payment is $106 per month. Ms. Ivory contends

13. Ms. Ivory testified that she cannot help her mother financially but does help in other ways.

My name is Tiffany Ivory. I am before this Court requesting a discharge of my student loan. Since my last appearance in Court I was hospitalized twice for asthma attacks. One of the hospitalizations lasted for over 1 week. After one of hospitalizations for an acute asthma attack, I lost my job at Medical Center East Hospital. Additionally, I have incurred further medical debt in the amount of $11,400.00 because of surgery and hospitalization making my financial future very bleak. I currently have no medical insurance, and the medical debts mentioned above will not be covered by insurance. I am responsible for the medical debts even though I have no way to pay it at the present time. I also have systemic Lupus which was in remission but has now resurfaced again. I am currently taking several medications which are not covered by insurance. These prescription drugs cost me $268.00 per month. Because of recent financial problems caused by the loss of my job and my deteriorating health, I was evicted from my home. I am currently being sued by my landlord for $6,200.00 for rental arrearages. Because of the eviction, I have had to move causing additional expenses. My new rent is $325.00 per month. I have recently secured employment with Franklin Collection Service. I am paid $8.50 per hour but have no health insurance through my new employer. However, I may also lose this job due to my health problems because I have already had to miss several days. I am afraid that I may have to go back on disability due to my inability to keep a job because of health problems.

I am requesting that my current employment status and my current medical debt be considered by this Court in determining whether to grant discharge of my student loan.

*Affidavit of Tiffany Ivory,* Proceeding No. 28, Adversary Proceeding No. 00–00014.

## V. Conclusions of Law

### A. The *Brunner* Factors

■ As discussed above, the *Brunner* factors assist a court in determining whether "undue hardship" (the criteria that section 523(a)(8) of the Bankruptcy Code requires a court to find before a student loan debt may be discharged), exists. If a court finds that the *Brunner* factors are satisfied, the court may then find that undue hardship exists and that a student loan is dischargeable.

Based on the evidence, the Court finds that Ms. Ivory has satisfied the three-part *Brunner* test. Specifically the Court finds that:

1. Ms. Ivory cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loan;

2. Additional circumstances exist indicating that Ms. Ivory's state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and,

3. Ms. Ivory has made a good faith effort to repay the loan.

Consequently, for the reasons expressed below, the Court finds that an undue hardship would be imposed on Ms. Ivory and her dependents if she is required to pay her student loan. Therefore, as allowed by section 523(a)(8), the Court concludes that excepting Ms. Ivory's student loan from her discharge in this case, "will impose an undue hardship," on her and her dependents. And finally, pursuant to section 523(a)(8), the Court concludes that Ms. Ivory's student loan is dischargeable.

## 1. The First *Brunner* Factor

The first *Brunner* factor requires Ms. Ivory to prove that she cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay her student loan. The key to that factor is of course: What is a "minimal standard of living?" [14]

 This Court believes that a minimal standard of living is a measure of comfort, supported by a level of income, sufficient to pay the costs of specific items recognized by both subjective and objective criteria as basic necessities. To determine whether this debtor can maintain that standard of living, this Court has: (a) identified the *specific items necessary for a minimal standard of living;* (b) conducted a *subjective evaluation of the debtor's income and expenses;* and (c) conducted an *objective evaluation of the debtor's income and expenses.*

### a. Specific Items Necessary for a Minimal Standard of Living

 This Court believes that a minimal standard of living in modern American society includes these elements:

1. People need shelter, shelter that must be furnished, maintained, kept clean, and free of pests. In most climates it also must be heated and cooled.

2. People need basic utilities such as electricity, water, and natural gas. People need to operate electrical lights, to cook, and to refrigerate. People need water for drinking, bathing, washing, cooking, and sew-er. They need telephones to communicate.

3. People need food and personal hygiene products. They need decent clothing and footwear and the ability to clean those items when those items are dirty. They need the ability to replace them when they are worn.

4. People need vehicles to go to work, to go to stores, and to go to doctors. They must have insurance for and the ability to buy tags for those vehicles. They must pay for gasoline. They must have the ability to pay for routine maintenance such as oil changes and tire replacements and they must be able to pay for unexpected repairs.

5. People must have health insurance or have the ability to pay for medical and dental expenses when they arise. People must have at least small amounts of life insurance or other financial savings for burials and other final expenses.

6. People must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.

### b. A Subjective Evaluation of the Debtor's Income and Expenses

#### (1) Expenses

Common sense, knowledge gained from ordinary observations in daily life, and general experience, establish skills from which most people can determine whether someone's expenses are unnecessary or unreasonable, whether someone is paying for something that is not needed, or

---

14. This Court has not previously answered this question. See *Halverson v. Pennsylvania Higher Education Assistance Agency (In re Halverson),* 189 B.R. 840 (Bankr.N.D.Ala. 1995); *O'Flaherty v. Nellie Mae, Inc. (In re O'Flaherty),* 204 B.R. 793 (Bankr.N.D.Ala. 1997); *In re White,* 243 B.R. 498 (Bankr. N.D.Ala.1999) *reh'g denied* 243 B.R. 515 (Bankr.N.D.Ala.1999).

whether someone is paying too much for something that is needed. This Court has called on those skills to evaluate Ms. Ivory's expenses for reasonableness and to establish a "minimal" monthly average for those expenses.[15]

Ms. Ivory described a budget in Schedule J of her bankruptcy petition that is severely limited. That budget includes expenses totaling $2,502, but it does not include many items that appear on the budgets submitted by most bankruptcy debtors such as child care, home maintenance, renter's insurance, health insurance, holiday gifts, birthday gifts, or school supplies and other school related expenses for children. It does not include any surplus for under-budgeted expenses and those other "unanticipated" expenses which seem, for every family, to inevitably pop-up each month but defy neat categorization. And it does not include other items that many would argue are "necessary" for even a minimal lifestyle. And unfortunately, it does not even represent Ms. Ivory's post-filing expenses or her current circumstances.

At trial and in her affidavit, Ms. Ivory testified that her monthly living expenses have increased dramatically. While her current rent is less than that at the time of the trial, she now has the additional debt burden represented by a $6,200 rent arrearage for which her prior landlord has filed suit. Her car has broken down requiring costly repairs. Her natural gas bill has risen dramatically.[16] Her monthly electricity and water bills have increased. She requires more medications than she did when she filed her petition. And her transportation expenses have increased.

Ms. Ivory's unpaid bills and other continuing obligations also contribute to increases in monthly expenses. She maintains arrearage balances for last winter's natural gas bills and for the twins' school tuition and after school care. She is still paying $53 a month toward the purchase of a computer and $25 a month for an internet provider. And she has incurred significant medical debts since filing her petition, debts she cannot discharge in this case.

Based on the above, the Court finds that if Ms. Ivory paid the expenses she listed in her Schedule J budget, (including the increases in those expenses since she filed bankruptcy), and she paid for necessary expenses omitted by her from the schedule, (such as car repairs and after-school care), her monthly expenses would be, at a minimum, $3,100.[17] The Court also finds that these expenses are both reasonable and necessary.

**15.** Like a jury, a court acting as a finder of fact is entitled to use common sense and general human experience and knowledge. *Pacific Emp. Ins. Co. v. Orren,* 160 F.2d 1011 (5th Cir.1947); *Southern Shipyard Corp. v. The Tugboat Summitt,* 294 F. 284, 285 (4th Cir.1923); *Luna v. Luna,* 592 N.W.2d 557, 565 (N.D.1999); *Gross v. Connecticut Mut. Life Ins. Co.,* 361 N.W.2d 259, 269–270 (S.D. 1985); *Kenney v. Rust,* 17 Mass.App.Ct. 699, 462 N.E.2d 333, 338 (1984), *review denied,* 391 Mass. 1106, 464 N.E.2d 73 (1984); *Richmond v. Richmond,* 340 Mass. 367, 164 N.E.2d 155, 157 (1960); *Mendoza v. Rudolf,* 140 Cal.App.2d 633, 295 P.2d 445, 447 (1956); *Johnson v. Snyder,* 99 Cal.App.2d 86, 221 P.2d 164, 167 (1950); *H.F. Wilcox Oil &*

*Gas Co. v. Johnson,* 184 Okla. 198, 86 P.2d 51, 53 (1937); *Cary–Glendon Coal Co. v. Carmichael,* 258 Ky. 411, 80 S.W.2d 29, 31 (1935). *overruled in part on other grounds, Kentucky Mountain Coal Co. v. Hacker,* 412 S.W.2d 581 (Ky.1967); *Fitzgerald v. McDonald,* 81 Colo. 413, 255 P. 989, 991 (1927).

**16.** The Court takes judicial notice that the price of natural gas rose dramatically during this time.

**17.** And that amount still does not include many items that most would consider necessary to maintain a minimal standard of living. It does not include any amount for unanticipated or emergency expenses, or home main-

### (2) Income

### (a) Base Income

Because Ms. Ivory's employment has been sporadic, it is difficult for the Court to establish a reliable income benchmark for determining whether or not she can support herself and her family and pay the debt to USDE. But, based on the evidence, it is possible to establish a reliable range sufficient to reach the conclusions necessary to resolve the matters before the Court.

When Ms. Ivory filed bankruptcy, she was working at Children's Hospital as a medical billing representative. Her gross monthly pay was $1,441 and her net pay was $1,051. According to Schedule I of her bankruptcy petition, she had held that position for only nine months. In the Spring of 2000, after filing bankruptcy Ms. Ivory was away from work for surgery. In May 2000, she was away from work for an additional six weeks to recover from that surgery. In July 2000, her position at Children's was eliminated. She remained unemployed for about six months. In January 2001, she went to work for Medical Center East. Her gross monthly pay for that new position was $1,567.[18]

During her brief eight months at Medical Center East, Ms. Ivory was frequently absent from work. She spent some of that time with her oldest son who was injured at school; however, most was consumed by three personal hospitalizations for asthma.

Ms. Ivory recently obtained a new job. Her gross pay is $1,360 per month. Unfortunately however, she has already missed time from that job because of illness. And she believes she is in jeopardy of losing that job also.

### (b) Government's Contention

■ The government contends that Ms. Ivory *can* pay her student loan debt while maintaining a minimal lifestyle; however, that contention assumes Ms. Ivory will be, and will remain, employed. Based on the evidence, this Court cannot make the same assumption.

Because of Ms. Ivory's unstable health and her children's chronic maladies, her employment has been sporadic. She has been unemployed frequently and for lengthy periods. There is no evidence that she will even be able to remain in her present job or that her general situation will change. In fact, the evidence supports the opposite.

During the past two and a half years, Ms. Ivory has had three different jobs with intermittent periods of complete unemployment. She has missed substantial time from her two prior jobs because of illnesses and has already missed time from her present job for the same reason. And again, she is in jeopardy of losing another job because of her illnesses.

The evidence demonstrates that Ms. Ivory is not employable on a full-time basis. And unless there is some dramatic change, either in condition or treatment, that situation will not change.

### (c) Maximum and Consistent Income

The evidence establishes that Ms. Ivory's only consistent income is the social security disability benefits her twins re-

---

tenance, or renter's insurance, or health insurance, or school related expenses, holiday gifts, or birthday gifts. It does not include anything for amortization of the approximately thirty-three thousand dollars in debt, (comprised of medical bills, rent arrears, school tuition and after-care arrears, and natural gas arrears), which Ms. Ivory has incurred since filing her bankruptcy petition.

**18.** In the interim (in November 2000), Ms. Ivory was hospitalized because of an acute asthma attack. Even if she had retained her job at Children's Hospital, she would have missed additional time from that position.

ceive. And it is clear from that evidence that those funds are not even sufficient for the needs they are intended to satisfy, much less enough to pay the additional necessary living expenses of the family.[19] And it is equally clear, from the analysis of her income discussed below, that even if Ms. Ivory is able to continue to be employed, whether part-time or full-time, her situation will not improve.

If Ms. Ivory works *half of the time,* (an amount consistent with past performance), the maximum she can expect to earn is about $628 per month.[20] That figure, added to the twins' $960 disability check, would create monthly "income" of $1,588. Assuming minimum expenses of $3,100, Ms. Ivory would already be about $1,500 in arrears in meeting her family's monthly basic necessities.

If Ms. Ivory could and did work *full-time,* (at her current monthly rate), her income would be about $2,216 (including the twin's $960).[21] Again, even with that additional income she could not pay $3,100, the amount the Court finds is necessary just to pay minimum expenses.[22]

In regard to income, the Court must conclude that Ms. Ivory will be unable to remain consistently employed at any job for any appreciable length of time and that Ms. Ivory's income, if it does not decrease, will at best remain the same.

### (3) Conclusions from a Subjective Evaluation

Ms. Ivory's income is *insufficient* to cover basic living expenses. Imposition of the additional burden of making *any* payment to the USDE would place her, and her children, in a state of deprivation more onerous than "substantial hardship." In other words, for Ms. Ivory and her children, life is already a "substantial hardship." Requiring her to pay her student loan would represent something worse, a level of sacrifice that is well beyond the statutory prerequisite for dischargeability. A single mother in ill health, with three unhealthy children, simply cannot provide a minimal standard of living on either $1,588 or $2,216 a month with expenses of at least $3,100.

From its *subjective evaluation* of Ms. Ivory's income and expenses, the Court concludes that Ms. Ivory cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loan. She simply does not have the money to provide for the basic necessities of modern

19. The government argues that the twins' social security benefits should be included in the calculation of Ms. Ivory's total income for purposes of deciding whether Ms. Ivory is able to pay her student loan. Even if this were legally correct, because Ms. Ivory cannot maintain a minimal standard of living *even with* the twins' social security payments, this Court need not address that issue.

20. Ms. Ivory's current income is $1,360. The Court divided that amount by two and subtracted $52 for social security and unemployment taxes (where the withholding rate for social security taxes is 6.2% and medicare withholding rate is 1.45%). See 26 U.S.C. § 3101(a) & (b)(6).

21. The Court added Ms. Ivory's current income of $1360, (less $104 for social security and unemployment taxes), to the twins' disability amount of $960.

22. Ms. Ivory's most recent circumstances demonstrate any amount she earns will be further reduced because she will be required to pay accumulated post-petition debts of $33,000. For example, it is reasonable to assume that creditors on those debts will attempt to collect those debts by garnishment. Under Alabama and federal exemption laws, Ms. Ivory can protect only 75% of her wages, or an amount that is equal to the 30 times the federal minimum wage, (currently $5.15 per hour), whichever is more. Consequently, it is fair to anticipate that garnishments would reduce the $1,588 income by about $40 per month to $1,548, and the $2,216 income by about $314 per month to $1,902.

life, much less have an ability to repay the student loan.

### c. An Objective Evaluation of the Debtor's Income and Expenses

#### (1) Widely Accepted Objective Criteria

Each criterion discussed below reflects a circumstance similar to Ms. Ivory's. Each

is a widely accepted objective measurement appropriate for comparing individuals' income and expenses.[23] And together, these items represent a part of the core of an objectively based minimal monthly bud-

**23.** Rule 201 of the Federal Rules of Evidence authorizes a court, whether requested or not and at any stage in a proceeding, to take judicial notice of a fact that is not subject to reasonable dispute in that it is either generally known within the territorial jurisdiction of the trial court or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. In this portion of its opinion, the Court takes judicial notice of, discusses, and relies on statistical data compiled by and published by the Bureau of the Census, United States Department of Commerce, the United States Department of Agriculture, the United States Department of Housing and Urban Development, and the American Automobile Association. There is ample authority to support taking judicial notice of, and reliance on, such widely accepted objective criteria.

That authority includes: *Parker v. Brown,* 317 U.S. 341, 363 n. 9, 364 n. 10, 365 n. 12, 366 n. 14–17, 367 n. 18, 63 S.Ct. 307, 87 L.Ed. 315 (1943) (judicial notice taken of statistical data about the California raisin industry appearing in publications of the U.S. Tariff Commission, the U.S. Department of Agriculture, the University of California, the Giannini Foundation of Agricultural Economics, the Federal Farm Board, the Commodity Credit Corporation, the Federal Surplus Commodities Corporation, the Surplus Marketing Administration, and the Agricultural Adjustment Administration); *Knox v. Butler* 884 F.2d 849 (5th Cir.1989) (census statistics), *cert. denied,* 494 U.S. 1088, 110 S.Ct. 1828, 108 L.Ed.2d 957 (1990); *Beardmore v. Department of Agriculture,* 761 F.2d 677, 679 (Fed.Cir.1985) (judicial notice taken of American Automobile Association's 1985 edition of the map of California); *Barber v. Ponte,* 772 F.2d 982, 998–99 n. 14–16 (1st Cir.1985) (judicial notice taken of official statistics respecting particular age group, including marital and divorce rates, school enrollment and educational attain-

ment, economic status, employment rate, criminality, experience in such matters as armed forces in time of war or peacetime, mental health, attitude towards such important social issues as abortion, participation in political processes, and ownership of capital property compiled by census bureau and U.S. Dep't of Health and Human Services), *cert. denied,* 475 U.S. 1050, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986); *Jones v. Illinois Dep't of Rehabilitation Services,* 689 F.2d 724, 728 (7th Cir.1982) (judicial notice taken that rubella epidemic in 1963–65 doubled number of births of hearing-impaired infants, with result that some 15,000 deaf individuals were at or approaching age of college or professional education, from study published in U.S. News & World Rep.); *U.S. v. United Bhd. of Carpenters and Joiners of America, Local 169,* 457 F.2d 210 (7th Cir.1972) (census statistics), *cert. denied,* 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (1972); *Skolnick v. Board of Comm'rs of Cook County,* 435 F.2d 361 (7th Cir.1970) (census statistics); *Celebrezze v. Wifstad,* 314 F.2d 208, 216 (8th Cir.1963) (judicial notice taken of facts regarding "dry farming" operations appearing in publications of the United States Department of Agriculture).

See also: *American Transit Lines v. Smith,* 246 F.2d 86, 90 (6th Cir.1957) (judicial notice taken of figures of American Automobile Association for 1955 showing that there were 62,-053,697 automobiles, including buses and trucks, in United States), *cert. denied,* 355 U.S. 889, 78 S.Ct. 261, 2 L.Ed.2d 188 (1957); *In re Snider Farms, Inc.,* 83 B.R. 1003, 1008 (Bankr.N.D.Ind.1988) (judicial notice taken of agricultural statistics issued by the Indiana Agricultural Statistics Service, a cooperative publication of the U.S. Department of Agriculture and Purdue University); *Knollwood Bldg. Condominiums v. Town of Rutland,* 166 Vt. 529, 699 A.2d 31, 42 (1997) (judicial notice taken of values published in annual aggregate

get for a family of four.[24]

### (a) Rent and Non–Telephone Utilities

According to the United States Department of Housing and Urban Development, the fair market value for rent and non-telephone utilities for the **lower 40th percentile of three bedroom rental residences** in the Birmingham, Alabama metropolitan area for the fiscal year 2001, is $717 per month. Dept. of Housing and Urban Development, *50th Percentile and 40th Percentile Fair Market Rents for Fiscal Year 2001; Final Rule,* 66 Fed.Reg. 165 (2001).

### (b) Groceries

According to the "Official USDA Food Plans," of the United States Department of Agriculture, the average monthly cost of

a "low-cost" meal plan for a family of four, with children of an ages similar to Ms. Ivory's, is $577.10.[25] That figure is based on the assumption that all meals and snacks are purchased at stores and prepared at home.

### (c) Personal items

According to the United States Bureau of the Census, the average consumer unit earning gross annual income of $15,000 to $19,999 spends $28.91 each month on "housekeeping supplies" and $24.50 each month on "personal care products." Bureau of the Census, U.S. Dept. of Commerce, *Consumer Expenditure Survey* 1999, "Table 2. Income before taxes: Average annual expenditures and characteristics."[26] Those amounts total $53.41.

fair market value report compiled by a public agency setting forth its factual findings pursuant to authority granted by law); *Kennedy v. Kennedy,* 662 So.2d 179, 182 (Miss.1995) (judicial notice taken of current timber prices in South Mississippi appearing in regular publication of Mississippi Department of Agriculture); *Baldzicki v. Baldzicki,* 1987 WL 8141, *3 (Ohio App.1987) (judicial notice taken of the United States Department of Agriculture's data on "annual cost of raising children"); *Hollinger v. Shoppers Paradise of New Jersey, Inc.,* 134 N.J.Super. 328, 340 A.2d 687, 690 (1975) (judicial notice taken of facts regarding nature and characteristic of the disease trichinosis contained in United States Department of Agriculture publications), *aff'd,* 142 N.J.Super. 356, 361 A.2d 578 (1976); *Application of Barbara,* 14 Misc.2d 223, 180 N.Y.S.2d 924, 930 (N.Y.Sup.Ct.1958) (judicial notice taken of map of New York published by the American Automobile Association), *aff'd,* 8 A.D.2d 580, 183 N.Y.S.2d 143 (1959); *Nicketta v. National Tea Co.,* 338 Ill.App. 159, 87 N.E.2d 30, 33 (1949) (judicial notice taken of facts regarding nature and characteristic of the disease trichinosis contained in United States Department of Agriculture publications); and *In re Oleson,* 68 S.D. 435, 3 N.W.2d 880, 881 (1942) (judicial notice taken of farm income and production in South Dakota per records of the United States and South Dakota Departments of Agriculture and of increase of

bank deposits in state per report of state Superintendent of the Banks).

**24.** These items do not include telephone expenses, child care expenses, school related expenses, expenses for household furnishings and appliances, home maintenance, life insurance, recreation, charitable contributions, or unanticipated expenses. And they do not include special financial needs of a family in which three of its members suffers from severe and chronic illnesses.

**25.** U.S. Dept. of Agriculture, *Official USDA Food Plans: Cost of Food at Home at Four Levels, U.S. Average, February 2001,* available at http://www.usda.gov/cnpp/FoodPlans/Updates/foodfeb01.PDF (October 19, 2001). The USDA calculation is based on the assumption that all meals and snacks are purchased at stores and prepared at home.

**26.** The argument could be made that those figures do not form an appropriate basis for comparison because they are categorized by income rather than family size. But according to different census figures, categorized by "size of consumer unit," the average consumer unit consisting of four persons spends even more, that is $60.50 each month on housekeeping supplies and $43.25 each month on personal care products for a total of $103.75. Bureau of the Census, U.S. Dept. of Commerce, *Consumer Expenditure Survey* 1999.

### (d) Transportation

According to the American Automobile Association, the cost to purchase, own, operate and maintain an economy automobile, assuming that it is driven 10,000 miles per year or less, is about 55.1 cents per mile.[27] Based on that data, an average monthly car-related expenditure is about $460.

### (e) Clothing

According to the United States Bureau of the Census, the average consumer unit earning gross annual income of $15,000 to $19,999 spends $113.00 each month on "Apparel and services." Bureau of the Census, U.S. Dept. of Commerce, *Consumer Expenditure Survey* 1999, "Table 2. Income before taxes: Average annual expenditures and characteristics." [28]

### (f) Medical Expenses

According to the United States Bureau of the Census, the average consumer unit earning gross annual income of $15,000 to $19,999 spends $160.00 each month on "Health care." Bureau of the Census, U.S. Dept. of Commerce, *Consumer Expenditure Survey* 1999, "Table 2. Income before taxes: Average annual expenditures and characteristics." The average consumer unit consisting of four persons, without regard to income, spends $172.50 each month on "Health care." *Id.,* "Table 4: Size of consumer unit: Average annual expenditures and characteristics."

According to a 1999 study conducted by the National Coalition on Health Care, privately obtained individual health insurance coverage costs a family of four from $416 to $583 a month. Steven Findlay & Joel Miller, *Down a Dangerous Path: The Erosion of Health Insurance Coverage in the United States* (National Coalition on Health Care 1999).[29]

### (g) Conclusions from Objective Criteria

Ms. Ivory's anticipated monthly income is $1588.00. The items discussed above cost between $1,967 and $2,223.[30] Obviously Ms. Ivory cannot pay for everything that she and her children need to live each month, much less pay for additional items, whether those items are essential or not. In fact, after paying for rent, non-telephone utilities, food, housekeeping supplies, and personal care items, Ms. Ivory will be left with nothing each month to pay for clothing, telephone, child care, school supplies, medical and dental expenses, household furnishings and appliances, home maintenance, life insurance, recreation, charitable contributions, automobile

"Table 4: Size of consumer unit: Average annual expenditures and characteristics."

**27.** This information is available from the American Automobile Association in its pamphlet, Your Driving Costs 2001, Stock No. 2717 (2001).

**28.** Once again, because these figures are categorized by income rather than size of family, the argument could be made that they do not form an appropriate basis for comparison. But again, different census figures, categorized by "size of consumer unit," indicate that the average consumer unit consisting of four persons spends even more, $224.83 each month, for "Apparel and services." Bureau of the Census, U.S. Dept. of Commerce. *Consumer Expenditure Survey* 1999, "Table 4:

Size of consumer unit: Average annual expenditures and characteristics."

**29.** That study can be viewed at, or downloaded from, *http://www.nchc.org/1999PolicyStudies/DownADangerousPath.html* (October 19, 2001).

**30.** While many of the above items above reflect "average" amounts for individuals or families, the Court does not suggest that "average" is necessary to maintain a "minimal" standard of living; however, it is obvious in Ms. Ivory's case that she and her family are so far below "average" that they are below "minimal." The *objective standards* discussed next clearly demonstrate that Ms. Ivory cannot even afford to pay for basic necessities.

related expenses, or unanticipated expenses.

The Court must conclude that like many people living on minimal income, Ms. Ivory cannot maintain a minimal standard of living.

### (2) Widely Accepted Objective Standards

Additional tools exist for evaluating a debtor's income and expenses. These include widely accepted *objective standards* utilized by governmental agencies and private organizations. These standards are helpful not only in evaluating an individual's income and expenses but are helpful also in comparing one individual's expenses and income to those of the general population.

### (a) Internal Revenue Service Collection Financial Standards

Internal Revenue Service "Collection Financial Standards" are objective standards used to determine "cut-outs", (as against IRS collection measures), of income for basic living expenses for delinquent taxpayers.[31]

Generally, the standards provide, "Necessary Expenses are the allowable payments you make to support you and your family's health and welfare and/or the pro-duction of income."[32] Specifically, the standards establish allowances for certain categories of expenses. These include:

1. various living expenses including food, housekeeping supplies, apparel and service, personal care products and services, and miscellaneous;
2. housing and utilities; and
3. transportation costs, to include ownership costs and monthly operating costs.

Within those categories, the standards allow:

1. a family of four, (earning gross monthly income of $1,250 to $1,669), $800 a month for various living expenses;[33]
2. a family of four or more living in Jefferson County, Alabama, $991 for housing and utilities;[34] and,
3. $642 for owning ($407) and operating ($235) one automobile.[35]

These standards suggest that a family of four in Ms. Ivory's income bracket needs $2,433.00 a month to pay for necessary living expenses. If the Court applied these standards to Ms. Ivory and her family, it is clear that she lacks sufficient income even to pay for the things the IRS believes she and her family need to survive each month.

---

**31.** The standards may be viewed at *http://www.irs.gov/plain/ind info/coil stds/index.html* (October 19, 2001).

**32.** Internal Revenue Service, U.S. Dept. of the Treasury, Offer in Compromise, *at http://www.irs.gov/plain/ind info/oic/necexpenses.html* (October 19, 2001). That characterization agrees with this Court's view that a minimal standard of living is one where a person earns the smallest degree of income necessary to cover expenses required to make a living and earn a salary, including expenses essential for daily existence.

**33.** Internal Revenue Service, U.S. Dept. of the Treasury, Tax Info for You, Collection Financial Standards, Allowable Living Expenses for Food, Clothing and Other Items, *at http://www.irs.gov/plain/ind info/coll stds/cfs-other.html* (October 19, 2001).

**34.** Internal Revenue Service, U.S. Dept. of the Treasury, Tax Info for You, Collection Financial Standards, Housing and Utilities Allowable Living Expenses for Alabama, *at http://www.irs.gov/plain/ind info/coll stds/cfs-al.html* (October 19, 2001).

**35.** Internal Revenue Service, U.S. Dept. of the Treasury, Tax Info for You, Collection Financial Standards, Allowable Living Expenses for Transportation, *at http://www.irs.gov/plain/ind info/coll stds/cfs-trans.html* (October 19, 2001).

### (b) United States Department of Health and Human Services' 2001 Poverty Guidelines

For convenience, some courts have adopted the United States Department of Health and Human Services Poverty Guidelines as the minimal standard of living for purposes of student loan dischargeability questions and recognize an annual income above or below that standard as exceeding or falling below the minimal standard of living.[36]

By definition poverty is, "The condition of having little or no wealth or material possessions; indigence, destitution, want."[37] In other words, it is, "Lacking the necessaries of life; in needy circumstances." [38] Clearly, if an individual lacks the necessaries of life, that individual cannot be said to be living a *minimal* standard of living.

■ In contrast, minimal means an amount, quantity, or degree that is the least possible.[39] Maybe it does not include everything an individual may want, but at least it includes the smallest degree of income necessary to cover those expense essential for daily existence. It is not, like poverty, a lifestyle lacking in necessities. It is an existence that includes making a living and earning a salary at such a level that the individual can maintain that level *and* pay a student loan. If it did not, how could a student loan ever be paid?

■ Because a "poverty" level of living and a minimal standard of living are so dissimilar, this Court does not accept that some small "current" income amount over the poverty level establishes a minimal standard of living. In the dischargeability context, an individual must be able to *maintain* a minimal standard of living before a court may require that person to pay a student loan. That decision cannot be made based simply on whether a debtor's annual income is above or below a poverty level. On the other hand, this Court does accept that these "poverty" level guidelines are helpful in comparing an individual's income and expenses to other individuals.

In that regard, according to the guidelines, a family of four with annual gross income of $17,650 or less, is considered "officially" impoverished. Ms. Ivory's anticipated gross family income, including the twins' social security benefits, is approximately $19,690 per year. That of course is an excess of $2,030 above the poverty line; however, it is clear that this amount will easily be consumed by the extraordinary health care expenses directly resulting from the severe and chronic illnesses suffered by Ms. Ivory and her children. Consequently, if the Court considers Ms. Ivory's extraordinary medical expenses, which it must, the Court must conclude that Ms. Ivory and her children are, in fact, living in poverty.

### (c) The Economic Policy Institute Studies

### (i) The First Study

In 2000, the Economic Policy Institute published an extensive and comprehensive

---

**36.** These guidelines define eligibility for certain government benefits and programs and are designed to assist the needy and economically disadvantaged. *Annual Update of the HHS Poverty Guidelines*, 66 FR 10695–01, 2001 WL 127217 (F.R.) (February 16, 2001).

**37.** Oxford English Dictionary, 2nd. Ed. 1989, *available at http://dictionary.oed.com* (October 19, 2001).

**38.** Oxford English Dictionary, 2nd. Ed. 1989, *available at http://dictionary.oed.com* (October 19, 2001).

**39.** Oxford English Dictionary, 2nd. Ed. 1989, *available at http://dictionary.oed.com* (October 19, 2001).

analysis and discussion of the specific budgetary requirements of American working families.[40] In this first study, the Institute identified basic needs and determined minimum monthly costs for those needs. Jared Bernstein, Chauna Brocht & Maggie Spade–Aquilar, *How Much is Enough? Basic Family Budget for Working Families* (Economic Policy Institute 2000).[41] Tables 8A and 8B of the study summarize budgets formulated by various scholars, economists, researchers, and government agencies for 19 basic needs.

The study demonstrates that the average monthly budget for a theoretical family consisting of a single parent and two children was $2,460.00. The lowest basic monthly budget reviewed for the same theoretical three-person family was $1,948.54. The average monthly budget for a theoretical family consisting of two parents and two children was $2,954.01. And the lowest basic monthly budget for the same theoretical four-person family was $2,239.55.

Comparison of these budgets to Ms. Ivory's budget demonstrates that Ms. Ivory does not earn enough to pay for basic needs. Her anticipated monthly income, (for use by four people) is less than the lowest monthly budget figure reviewed in the study, (an amount based on the needs of three.) And it is clear that Ms. Ivory's current situation must be even more disparate when inflationary differences in the study's 1996 figures and Ms. Ivory's 2001 figures are considered.[42]

## (ii) The Second Study

Subsequent to "How Much is Enough," EPI published a second and similar study. The second study established basic family budgets for every metropolitan area in the United States and a combined rural budget for each state. The study explains:

To create these budgets, we first determined the items necessary for a working family to maintain a safe and decent standard of living, then determined the cost of providing each item at an adequate level based on family composition. The cost estimates are based on the following sources (see Appendix A for a more detailed account of the methodology):

Food is based on the minimum amount a family needs to spend for food prepared at home, as recommended by the U.S. Department of Agriculture's "low cost food plan."

Housing is based on a two-bedroom apartment (for families with one or two children) or a three-bedroom apartment (for families with three children) that costs no more than 40% of all structurally safe and decent housing in the community, as measured by the Department of Housing and Urban development's fair market rents.

Health care expenses are based on an amount that recognizes that not all families receive health insurance

---

**40.** The Economic Policy Institute is a nonprofit, nonpartisan organization. According to the information published at *http://www.epinet.org* (October 22, 2001), its mission is to, "provide high-quality research and education in order to promote a prosperous, fair, and sustainable economy."

**41.** This study and the second study discussed below can be downloaded from the EPI at *http://www.epinet.org/* (October 19, 2001).

**42.** In addition, the study was ostensibly based on the needs of families with ordinary medical requirements. Ms. Ivory's family has substantially greater financial needs than the average family. If that factor is considered, it is clear that the differences between Ms. Ivory's needs and those of other families of four would be even greater.

through their employers. We use a weighted average of the employee share or the premium for employer-sponsored health insurance (from the Bureau of Labor Statistics) and the premium costs for a non-group plan (from an online insurance quote service), plus the cost of out-of-pocket medical expenses (from a Levin Group model).

Transportation costs are based on average miles driven for work and other necessary trips. This amount takes into account different driving distances for cities, suburbs, and rural areas, from the Department of Transportation, and is based on the cost-per-mile estimates from the Internal Revenue Service.

Child care expenses are based on center-based child care or family care centers for 4– and 8–year-olds, as reported by the Children's Defense Fund.

Other necessary expenses are based on the cost of telephone service as reported by the Federal Communications Commission, and the cost of clothing, personal care, household items, bank fees, union dues, reading materials, school supplies, and television as reported in Consumer Expenditure Survey.

Taxes include federal payroll taxes and federal, state, and local income taxes. This expense also takes into account funds received from the federal and state EITC and the Child and Dependent Care Tax Credit.

The budgets do not include the cost of restaurant meals, vacations, movies, or savings for education or retirement.

Heather Bouchsey, Chauna Brocht, Bethney Gunderson, & Jared Bernstein, *Hardships in America: The Real Story of Working Families* 8–9 (Economic Policy Institute 2001).

From that criteria, the researchers determined that a family of four, consisting of one parent and three children, living in Birmingham, Alabama, needs a gross monthly income of $3,165.00, (or about what this Court calculated the minimal costs of *Ms. Ivory's* basic necessities), to provide themselves with basic necessities. Obviously, Ms. Ivory's anticipated monthly income is much less.

**(d) Conclusion to Objective Standards**

The Court finds that Ms. Ivory cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay her student loan.[43] She simply does not have the money to provide for the basic necessities of modern life, much less an ability to repay the student loan.

**d. Conclusion to the First *Brunner* Factor**

From both the subjective and objective evaluations discussed above, the Court concludes that Ms. Ivory cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay her student loan.

**2. The Second *Brunner* Factor**

The second *Brunner* factor asks whether there are additional circumstances that exist which indicate the state of affairs (that is the debtor cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loan) is likely to persist for a significant portion of

---

**43.** This conclusion would be the same even if the Court assumed that Ms. Ivory will work a full 40 hour work week, that existing creditors will not garnish her paycheck, and that Ms. Ivory's income is $2,320 ($1,360 wages plus $960 social security benefits).

the repayment period of the student loan. Clearly there are such circumstances here.

Ms. Ivory's income is insufficient to support a minimal lifestyle or to pay for simple necessities. She is living "hand-to-mouth", "paycheck-to-paycheck", and has been doing so for many years. Financially, the future promises no better. Ms. Ivory has no special skills which might qualify her for more lucrative paying jobs. And her opportunities for training and education are severely limited because of a lack of funds and those opportunities are consistently interrupted by her various illnesses and by the demands of caring for sick children and an elderly mother.

Ms. Ivory's severe and persistent illnesses, and those of her children, effectively prevent her from working on a full time, daily basis. Absences resulting from those illnesses have already cost her several jobs. Those same illnesses, which are not getting better and which are likely to persist, have generated an avalanche of medical bills and continue to press her further in debt.

Ms. Ivory's austere financial existence has persisted well beyond the repayment period of her student loan. That existence is a direct result of her infirm physical condition, the infirm condition of her children, and her limited earning capacity, (which is restricted not just by her physical infirmities, but also by her limited education and training.) None of these conditions are likely to change.

In regard to the second *Brunner* factor, the Court finds that additional circumstances exist and that those circumstances indicate that Ms. Ivory's state of affairs will persist for a significant portion of the repayment period.

### 3. The Third *Brunner* Factor

The third *Brunner* factor questions whether a debtor has made a good faith effort to repay the loan.

Ms. Ivory contends because she has never had the financial ability to pay her student loan, her failure to make payments on her student loan cannot constitute bad faith.

The government contends that Ms. Ivory may not rely on an inability to pay to demonstrate good faith, but that she must affirmatively demonstrate that, "she has made a 'true effort' to maximize financial resources and has been careful to minimize expenses," and that she must, "show that she has made a *bona fide attempt* to repay the student loan." *Defendant's Response to Plaintiff's Statement of Position* at 3, filed June 15, 2001, Proceeding No. 26 in Adversary Proceeding No. 00–00014.[44]

#### a. Maximize Income and Minimize Expenses

In support of its first contention the government argues, "As to the first requirement, a debtor cannot be found to have maximized financial resources and minimized expenses, when the debtor has *created or contributed* to his or her own financial hardship." *Id.* at 4 (citations omitted) (emphasis added). The government concludes:

> In our present case, Plaintiff, after incurring her student loan indebtedness, choose to have three children even though she had no husband and her health was allegedly so poor as to render it difficult to work to support herself. This decision was not beyond the Plaintiff's control and clearly shows no effort to minimize expenses.

---

44. Citing *Pennsylvania Higher Education Assistance Agency v. Deborah Lee Johnson (In re Johnson)*, 5 Bankr.Ct.Dec. 532 (Bankr.E.D.Pa. 1979).

*Id.* (citations omitted).[45]

This Court must reject that argument. There is nothing in the Bankruptcy Code that suggests that Congress did not intend for student loan debtors to procreate. The reasons for such an omission are obvious. Writing for the United States Supreme Court in *Carey v. Population Services, Intern.,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), Justice William J. Brennan, Jr. stated:

> Although "(t)he Constitution does not explicitly mention any right of privacy," the Court has recognized that one aspect of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment is "a right of personal privacy, or a guarantee of certain areas or zones of privacy." *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). This right of personal privacy includes "the interest in independence in making certain kinds of important decisions." *Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). While the outer limits of this aspect of privacy have not been marked by the Court, *it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions "relating to . . . procreation, Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 541–542, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). . . ."

*Id.* at 684–85, 97 S.Ct. 2010 (citing *Roe v. Wade,* 410 U.S. 113, 152–53, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)) (emphasis added).

Further in *Carey,* Justice Brennen explained specifically:

> The decision whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected choices. That decision holds a particularly important place in the history of the right of privacy, a right first explicitly recognized in an opinion holding unconstitutional a statute prohibiting the use of contraceptives, *Griswold v. Connecticut,* [381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)] supra, and most prominently vindicated in recent years in the contexts of contraception, *Griswold v. Connecticut,* supra; *Eisenstadt v. Baird,* supra; and abortion, *Roe v. Wade,* supra; *Doe v. Bolton,* 410 U.S. 179[, 93 S.Ct. 739, 35 L.Ed.2d 201] (1973); *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). This is understandable, for in a field that by definition concerns the most intimate of human activities and relationships, decisions whether to accomplish or to prevent conception are among the most private and sensitive. "If the right of privacy means anything, it is the right of the individual, married or single, to be free of unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird,* supra, 405 U.S., at 453[, 92 S.Ct. 1029]. (Emphasis omitted.)

*Id.* at 685, 97 S.Ct. 2010.

Absent an unequivocal pronouncement from Congress, or a court with authority to bind this Court, this Court will not find that an obligation to pay a student loan is superior to an individual's fundamental right of procreation.

Consequently, the Court finds that under Ms. Ivory's particular impecunious circumstances, the "good faith" element of

---

**45.** The government also argues that the debtor did not minimize expenses because she did not move to less expensive housing. Since the trial, the debtor has moved to less expensive housing.

the *Brunner* test has been satisfied. After incurring her student loan, Ms. Ivory has remained optimally employed, when her health allowed. Unfortunately, her lack of any specialized skills has relegated her to relatively low-paying jobs; however, during that time she has demonstrated a willingness to accept those positions. Other than sacrificing even more, there is nothing else Ms. Ivory could have done. This Court will not consider whether "not having children" is such an appropriate sacrifice.

### b. Bona Fide Effort to Pay

■ In support of its second contention the government argues:

> As to the second requirement of the *Johnson* test, the Plaintiff testified she never contacted the Department of Education to try to set up a payment schedule or compromise her indebtedness, and never made a voluntary payment on her indebtedness, because her sister told her no payment was necessary if the school she had attended had gone out of business. She also testified she made no effort to verify the accuracy of her sister's advice. Thus, Plaintiff cannot be said to have made a bona fide attempt at payment.

*Id.* at 5.

It has been asked, "Can't everyone pay just a little?" That question may be answered, "A debtor's ability to pay is a function of the level of sacrifice demanded." Teresa A. Sullivan, et al., *As We Forgive Our Debtors* 200 (1989).

Applying this sobering hypothesis, clearly the direct answer to the question is yes, everyone can pay something.[46] But, as a society we have decided that we are not going to demand certain levels of sacrifice, *at least with regard to payment of student* loans. We are not going to require an individual to pay a student loan if that person cannot maintain a minimal standard of living. The reasoning lies in the structure of the Bankruptcy Code.

Most of the debts designated in section 523 of the Bankruptcy Code as "non-dischargeable" are simply that—not dischargeable under *any* circumstances. Student loan debts are an exception; their "non-dischargeability" is *qualified.* A student loan *may* be discharged if excepting it from discharge would impose an "undue hardship" on the debtor.

■ Yes, everyone may be able to squeeze out a few "bucks" here and there, but neither Congress nor the *Brunner* court intended the price of a student loan discharge to be deprivation of basic needs. Demanding a sacrifice of that nature would be contrary to the Bankruptcy Code and at a minimum would thwart the congressional intent of section 523(a)(8)—that is, it could prevent student loans from ever being discharged.

This interpretation fits with the *Brunner* court's three-part test. A "hardship" that is "undue" is a condition, "which presses unusually hard upon one who has to endure it" and is beyond what is appropriate, warranted, or natural.[47] A person

---

46. Ideally, a budget that reflects a minimal lifestyle does not contain anything unnecessary. In terms of a minimal standard of living, unnecessary could mean one of two things: (1) that is money is spent on something that is never necessary; or, (2) that *too much* is spent on something that *is* necessary. Clearly, a person with a student loan debt who can afford a minimal standard of living,

but has money left over, should pay that debt. But what that person may purchase before reserves are *allowed* to accumulate, is of course what defines a minimal standard of living.

47. Oxford English Dictionary, 2nd. Ed. 1989, *available at http://dictionary.oed.com* (October 19, 2001).

who earns enough *only* to supply himself or herself with the means to survive and make a living, (and is not lacking in necessities), cannot pay *any* additional debt without suffering "undue hardship."

Clearly Congress did not intend, and the *Brunner* court did not recognize, that *given the appropriate level of sacrifice*, everyone has some "ability," to make some payment on a student loan. A person faced with the responsibility to pay a debt may be required to tighten his or her belt, but not so tight to cut off blood supply.[48]

Ms. Ivory clearly does not have an ability to pay her student loan debt and it is apparent that *she has never had that ability*. Consequently, she had, prior to the filing of the present Chapter 7 case, paid very little, if anything, on her student loan.[49] Should that be held against her? This Court believes not. There is no evidence that her failure to make more than token repayment, or no payment at all, is the result of "bad faith." Instead, the evidence indicates that Ms. Ivory failed to make payments because she did not have any money.

**4. Conclusion to *Brunner* Factors**

Ms. Ivory cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loan. Ad-

ditional circumstances exist indicating that Ms. Ivory's state of affairs is likely to persist for a significant portion of the repayment period of the student loan. Ms. Ivory has made a good faith effort to repay the loan. Consequently, excepting Ms. Ivory's student loan debt from her discharge in this case will impose an undue hardship on her and her dependents. Ms. Ivory's student loan should be discharged.[50]

**VI. Conclusion**

The Court finds that Ms. Ivory cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay her student loan, or any part of that loan, whether voluntarily through an agreed payment plan, or involuntarily through state law collection remedies. The Court also finds that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan as there is no realistic prospect that Ms. Ivory's financial situation will improve. And the Court finds that Ms. Ivory has made a good faith effort to repay the loan.

Consequently, the Court concludes that excepting Ms. Ivory's student loan debt from her discharge will impose an undue

---

**48.** This Court has not addressed the issue of whether a debtor may be required to, or allowed to, pay part of a student loan debt. See the discussion of that issue in the opinion of another member of this Court in *Howell v. The Education Resources Inst.*, 1996 WL 1062559 (Bankr.N.D.Ala.1996).

**49.** There is some dispute on this point. Ms. Ivory testified that she may have made a couple of small payments on the loan. The Government, in its brief, asserts that she has made no payments, but offered no evidence in support of that assertion at trial.

**50.** In its brief, the government suggests that Ms. Ivory should pay $15 each month for the

next 10 years. In regard to the legal issues involved in that suggestion, see the case cited in note 48. In regard to the factual issues, this Court sees nothing to demonstrate that Ms. Ivory could ever consistently maintain a minimal lifestyle while making any meaningful payment toward her student loan debt, no matter how low the payment or how long the repayment period. As discussed throughout this opinion, this Court believes that the *payment of any additional debt* by a person who only earns enough to supply himself or herself with the means to survive, is an undue hardship.

hardship on her and her dependents. Ms. Ivory paid what she was able to pay. She maintained employment commensurate with her level of education and training and she earned income which coincides with her optimal earning potential. She has done enough and is entitled to a discharge that includes her student loan.[51] This Court will not demand any further sacrifice.

Ms. Ivory's student loan debt is dischargeable. The Defendant's Motion to Dismiss the complaint is denied.

---

51. In reaching its findings of fact and conclusions of law, the Court relies on its opinions in *Halverson v. Pennsylvania Higher Education Assistance Agency (In re Halverson)*, 189 B.R. 840 (Bankr.N.D.Ala.1995); *O'Flaherty v. Nellie Mae, Inc. (In re O'Flaherty)*, 204 B.R. 793 (Bankr.N.D.Ala.1997); and *In re White*, 243 B.R. 498 (Bankr.N.D.Ala.1999) *reh'g denied* 243 B.R. 515 (Bankr.N.D.Ala. 1999) and the authority cited in those opinions.