In re Stephanie RUTHERFORD,
Debtor.

Stephanie Rutherford, Plaintiff,

v.

William D. Ford Direct Loan
Program, Defendant.

Bankruptcy Nos. 02–05085–BGC–7.
Adversary No. 02–00208.

United States Bankruptcy Court,
N.D. Alabama,
Southern Division.

May 24, 2004.

Helen Ball, Kenneth Lay, Legal Services, Birmingham, AL, for Plaintiff–Debtor.

Richard O'Neal, Assistant United States Attorney, Birmingham, AL, for Defendant.

**Memorandum Opinion**

BENJAMIN COHEN, Chief Judge.

This matter came before the Court on a *Complaint to Discharge Student Loan* filed by the Plaintiff on August 28, 2002. After notice, a trial was held on August 13, 2003. Appearing were the debtor; her attorneys Helen Ball and Kenneth Lay; Richard O'Neal for the defendant; Danielle Smith, a representative of the defen-

dant; and Kathleen Rutherford, the debtor's mother and a witness.[1]

## I. Background

Between 1995 and 2002, the debtor borrowed about $30,000 to attend college. She has not paid that debt and seeks to discharge it in the pending Chapter 7 case.

The debtor's initial course of study was nursing. She eventually received a medical assistant's certificate, which has since expired.

The debtor's mother suffers from multiple sclerosis. The debtor's failures to meet her education goals or to pay her student loan debt are directly related to her "choice" to become, and remain, her mother's only care giver.

## II. Issues

■ A student loan debt is not dischargeable in bankruptcy unless, "excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). Consequently, in proceedings to determine the dischargeability of a student loan, there are two issues: (1) is there a debt; and (2) if there is, would paying that debt impose an undue hardship on the debtor and the debtor's dependents.

## III. Legal Standards

### A. Section 523(a)(8)

Section 523(a)(8) of the Bankruptcy Code reads:

(a) A discharge under section 727 ... [of the Bankruptcy Code] does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured or guaran-

teed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents;

11 U.S.C. § 523.

### B. Burdens of Proof

#### 1. Proving a Debt

■ The creditor opposing dischargeability of a student loan debt has the initial burden of proving the existence of the debt. The creditor must prove that there is a debt and that the debt is for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution. If the creditor meets that burden, the burden shifts to the debtor to prove undue hardship.

Because the debtor agreed that she has an unpaid student loan, the Government satisfied its burden. Therefore at trial, the burden shifted to the debtor to prove that paying the debt would impose an undue hardship on her and her dependents.

#### 2. Proving Undue Hardship

■ The debtor has the burden of proving "undue hardship." In *Hemar Ins. Corp. of America v. Cox (In re Cox)*, 338 F.3d 1238 (11th Cir.2003), *reh'g denied* and *reh'g en banc denied*, 82 Fed.Appx. 220 (11th Cir.2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 2016, 158 L.Ed.2d 496 (2004), the Court of Appeals for the Eleventh Circuit

---

1. The Court adopts and relies on its opinion and order in *Ivory v. United States (In re Ivory),* 269 B.R. 890 (Bankr.N.D.Ala.2001).

adopted the three-part test originated by the Court of Appeals for the Second Circuit in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2nd Cir.1987), as this Circuit's test for proving "undue hardship." The *per curiam* opinion of the Eleventh Circuit court stated:

> [to establish "undue hardship," the debtor must show] (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* at 1241 (quoting *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395, 396 (2nd Cir.1987)).

## IV. Findings of Fact

### A. Ms. Rutherford's Student Loans

#### 1. Three Accounts

Ms. Danielle Smith, a student loan expert with the United States Department of Education, Federal Student Aid, Borrower's Services, testified for the Government. She explained the debtor's loan history.

Ms. Rutherford had three loan accounts with the Government. The first account consisted of five Stafford subsidized loans. The total amount was $10,916. The first disbursement was March 22, 1995. The last was January 1, 1997. The first payment would have been due January 7, 1999, but the debtor defaulted. The account was transferred for collection on September 5, 2001. The amount due at transfer was $13,425.61. No payments were made on this loan.

Ms. Rutherford's second account included two Stafford loans. One was subsidized; one was unsubsidized. The total amount was $6,625. The first disbursement was August 9, 1999. The last disbursement was February 7, 2000. The first payment would have been due August 7, 2000, but the debtor defaulted. The account was transferred for collection. The amount due at transfer was $7,368.16. No payments were made on this loan.

Ms. Rutherford's third account, the account subject to the instant proceeding, was a consolidation loan for $30,672.63. The debtor used the funds from the consolidated loan to pay the loans from the accounts described above.[2] The debtor applied for that loan in January 2002. She executed a promissory note on January 9, 2002. Defendant's Exhibit 12. The first payment was due on April 7, 2002. As of August 10, 2003, the balance was $33,238.55. That amount included unpaid interest of $2,948.37.

#### 2. Income Contingent Repayment Plan (ICRP)

When the debtor obtained her consolidation loan, there were four available repayment plans. The debtor chose the Income Contingent Repayment Plan (ICRP). Defendant's Exhibit 14. Ms. Smith explained that the ICRP was the most flexible of the four because it allowed the Government to consider a borrower's annual adjusted gross income, family size, and total loan debt. Transcript at 102. Under the ICRP, the monthly payment is calculated on a percentage of the borrower's discretionary income. That income is defined as the borrower's annual adjusted gross income less the poverty level for the borrower's family size. Transcript at 103. Con-

---

**2.** Defendant's Exhibit 11 describes the debtor's loan history.

sequently lower income borrowers would have lower monthly payments.

The maximum ICRP period is twenty-five years. After twenty-five years, any balance due is discharged by the Government; however, that balance is reported to the Internal Revenue Service.

### 3. Poverty Level and Payment Amount

The Government calculated Ms. Rutherford's income level and the amount of her monthly payments based on that income level. Ms. Rutherford's income level was, and is, below the poverty level. Consequently her monthly loan payment was zero. Again, testifying for the Government, Ms. Smith explained:

> Q. And for the purposes of today's hearing have I requested that you calculate what her payment would be under the income contingent repayment program based on the factors that you would include?
>
> A. Yes. I did two calculations. One based upon a family size of one and one based upon a family size of two.
>
> Q. Okay. With regard to the family size of one, can you tell us what those factors are, what you included and then what the monthly payment would be?
>
> A. Yes. Based upon an interest rate of six point five percent, a loan amount of thirty-three thousand, two hundred and thirty-eight dollars and fifty-five cents and, as I said, I used an adjusted gross income of seventy-two hundred and a family size of one, Ms. Rutherford's

monthly payment under ICR would be zero due to the fact that it is **below the poverty level**.

> Q. And what is that poverty level for a family of one?
>
> A. The poverty level for a family size of one is eight thousand, nine hundred and eighty dollars.
>
> Q. Okay. You said you also computed it for a family size of two.
>
> A. Yes.
>
> Q. And what factors did you use and what would be the payment?
>
> A. I used the same factors. I used six point five as an interest rate; thirty-three thousand, two hundred and thirty-eight dollars and fifty-five cents for the loan amount; adjusted gross income, seventy-two hundred; and family size, two. The payment would still be zero because that is also **below the poverty level** for a family size of two, which is twelve thousand, one hundred and twenty dollars.

Transcript at 108–09 (emphasis added).[3]

### B. Ms. Rutherford's Relationship with her Mother and Her Mother's Chronic Illness

Ms. Rutherford's mother has had multiple sclerosis since 1982. She was diagnosed in 1987. As the discussion below demonstrates, Ms. Rutherford's relationship with her mother, and almost every other aspect of the debtor's adult life has been, and continues to be affected by, her mother's condition.[4]

---

3. The debtor lives with her mother. They share income and expenses. When the debtor chose the ICRP option she did so based on a family size of two. Defendant's Exhibit 14. As the above demonstrates, the Government calculated the debtor's income lever based both on a family size of one and a family size of two. In both instances the income level was below the poverty line. While there was some testimony that if the debtor's income is combined with her mother's, the two together might live above the poverty level, transcript at 116–17, the Court does not believe this would be significant. See its discussion of "poverty level" and "minimal standard of living" below.

4. Because Ms. Rutherford's own words are so compelling, her testimony is quoted extensively rather than summarized.

## 1. Daily Routine

When asked, "let's look at what a day looks like for you," Ms. Rutherford explained:

A. Where do you want me to start in the morning? Midnight?

Q. Let's start at eight a.m. Let's start from there and tell me what it is like.

A. I usually have to get up about 6:30.

Q. All right. Start at 6:30.

A. How detailed do you want?

Q. You just go ahead and explain as thoroughly as you can and I will stop you if I need to.

A. Okay. I get my mom up. I mean not get her out of bed. I wake her up, feed her, give her her medicine, change her and just get her situated.

Q. All right. What is next for you?

A. I go to work and work until about 11:00, 11:30 and come home.

Q. Okay. So about how many hours do you work in the morning?

A. It is mostly from 8:30 until 11:30.

Q. Okay. What is next?

A. Lunch.

Q. And what do you do during lunchtime?

A. I have to feed her, catheterize her, change her and give her her medicine.

Q. Does your mom sit up while you are gone or do you have to put her back to bed?

A. She does stay in bed while I'm gone.

Q. Why can't she sit up?

A. Because she just can't.

Q. All right. Tell me what the afternoon is like.

A. If she has a doctor's appointment, I get her up and take her to the doctor or she gets up and sits in her wheelchair.

Q. Do you ever work an afternoon shift?

A. Sometimes. If I'm needed at Mass Marketing Concepts, I will go back like about three hours in the afternoon.

Q. All right. What happens after an afternoon shift?

A. I go home and do dinner.

Q. All right. What is dinner like?

A. You cook dinner, you feed her and just—

Q. What type of care does she need from you at dinnertime besides feeding her? When you first come home, what do you have to do?

A. Well, I have to prepare dinner for her.

Q. All right.

A. Put in her teeth if they are not in but that is usually done in the morning.

Q. Just go ahead and tell the court in detail what it takes.

A. Cook dinner and I feed her.

Q. Okay. What happens to the rest of the evening?

A. I have to catheterize her. She watches TV and then about ten o'clock I change her and catheterize her again and give her her medicine.

Q. Do you ever work evenings?

A. I work on Wednesday evening at church.

Q. What does your mom do while you are gone during the evening time?

A. She will stay in bed and watch TV and, if I'm gone for so many hours, my cousin comes and checks on her.

Q. What type of care does your cousin provide?

A. She just makes sure she is okay and gives her some water.

Q. She doesn't stay with her regularly, does she?

A. No, she just drops in and just gives her a drink.

Q. Okay. On the nights that you work, when you come home what do you do?

A. Like what do you mean?

Q. What do you do for your mother when you come home?

A. After I feed her?

Q. Say you have gone to work at Dawson on a Wednesday night, what happens when you come home?

A. Well, I feed her before I leave and then I come home and she is in bed, mostly just whatever she needs done. I give her her medicine before she goes to sleep and she has to wear braces. I have to put her braces on when I'm there because she can't have them on when I'm not.

Q. Okay. So after you have done that, it is time for bed time.'

A. I get up during the night for her, yes.

Q. How often do you get up?

A. Sometimes two or three times a night.

Q. Why do you have to get up?

A. Sometimes she is hot, her braces are bothering her because she is supposed to sleep in them, she needs something to drink or she is just uncomfortable because she needs to be rotated.

Q. Does she have to be turned often?

A. She needs to be rotated ever so often so she won't get bed sores.

Q. So she has to be turned even during the night to prevent bed sores?

A. If she is uncomfortable, yes.

Q. Okay. And then your day starts again at 6:30; is that correct?

A. Yes.

Transcript at 34–38.[5]

## 2. Immediate Family Members

But are there not other family members that could help the debtor? Ms. Rutherford reluctantly answered that question. She testified:

Q. Do you have any brothers and sisters?

A. I have a brother and a sister.

Q. Do they live in town?

A. Yes.

Q. Where do they live?

A. One lives in Homewood and my sister lives with my dad.

Q. And how old is the sister that lives with your dad?

A. She is eleven.

Q. And what about the brother or sister that lives in Homewood?

A. He is thirty-one.

Q. He is how old?

A. Thirty-one.

Q. And what does he do for a living?

A. Right now I really don't know. He is kind of in between stuff. I really don't know what he does. He was working for McMillan and Associates and now he wants to be a financial advisor.

Q. All right. Do you know if he has time to take care of your mother?

A. No.

Q. Have you ever asked him?

A. Yes.

Q. Has he refused to?

---

**5.** The debtor's mother testified. She supported her daughter's testimony that the debtor offers, and needs to provide, twenty-four hour care for her. Mrs. Rutherford also testi- fied that her insurance coverage would not pay for the extensive care her daughter provides.

A. He just doesn't seem to have time.

Transcript at 54.

The debtor's mother and father are divorced. Her mother receives alimony from her father.

### 3. Other Assistance

Ms. Rutherford receives little other assistance and is unable to escape the situation for any reasonable time. The debtor was asked, "Do you have anyone who comes in and cooks and cleans for your mother?" Transcript at 44. She answered:

A. No.

Q. Who does that?

A. Me.

Q. Do you have anyone who comes and sits with her while you are away, say, on a vacation or anything like that?

A. No.

Q. Have you had a vacation in the last three years?

A. I had one last September.

Q. Where did you go?

A. I went to the beach.

Q. How long were you gone?

A. Just for a weekend.

Q. How did that work out with your mother?

A. Well, my grandmother and my aunt and they smoke, so that is not a good situation for her.

Q. It is not a good situation for your Mom when you're not there?

A. Well, it is not a good situation for her to stay with them because of their smoking habits.

Q. Can you tell us why? Because they smoke?

A. They smoke and she doesn't need to be around it.

Q. Okay. If you did not care for your mother, what type of person would you have to hire in order to take care of her?

A. If I didn't do it?

Q. Right.

A. I would have to hire a sitter.

Q. What else? What type of person would you need? They would have to know how to do medical things; is that right?

A. I guess a qualified sitter from a home health agency who would do everything.

Q. Cook and clean also?

A. Yeah. I mean someone would have to do it.

Transcript at 44–45.

### 4. The Future

What does the future hold for Ms. Rutherford and her mother? The evidence shows that her mother may live another twenty years with her illness. And during that time, her situation could worsen. The debtor testified:

Q. Do you know how long your mother is expected to live with her multiple sclerosis?

A. She could live another **twenty years**. I asked her doctor during the deposition.

Q. Another twenty years?

A. He said he can't say.

Q. And as long as she is there, she will need your care; is that right?

A. Yes.

Q. **Say there came a time when you could not provide that care, what would you have to do?**

A. **Put her in a nursing home.**

Q. **And who would pay that bill?**

A.  Me.

Transcript at 48–49 (emphasis added).

### C.  Ms. Rutherford's Education

As the evidence demonstrates, even Ms. Rutherford's attempts to receive a formal education were impacted by her relationship with her mother.  She began college at Auburn University in 1993.  To attend what she believed was a better nursing school, Ms. Rutherford transferred to the University of Alabama in Birmingham (UAB) in 1995. Because her mother was "in and out of the hospital", transcript at 23, Ms. Rutherford left UAB in 1998.  She returned to UAB in 1999 when her mother was, "able to stay by herself."  Transcript at 23–24.  She eventually left UAB and attended Virginia College, where she graduated and was certified as a medical assistant.  That certification allowed her to, "do lab work in a lab, work in a doctor's office as a nurse and phlebotomy and stuff like that."  Transcript at 24.  Ms. Rutherford's certification has since expired.  Transcript at 47.

### D.  Ms. Rutherford's Employment

The debtor's employment was and is especially impacted by her mother's health.  Again, the debtor's own words are compelling.  She testified:

Q.  Okay.  Were you able to get employment after your certification?

A.  Yes.

Q.  Tell us about that.

A.  I worked for Baptist Health System as on-call for a medical assistant.

Q.  What do you mean by on-call?

A.  It is when a clinic has a nurse out, they call you and you fill in for them.

Q.  Did you try to find a full-time job?

A.  Yes.

Q.  Explain a little bit about what you did to try to find a full-time job.

A.  Answered ads in the paper, sent resumes but people want people with experience and I was out of school and I didn't have experience.

Q.  How long did you work for Baptist Health Systems?

A.  Probably from June until September 2000.

Q.  And you said you finished working with Baptist Health System in September of 2000?

A.  Yes.

Q.  All right.  Let's step back a little bit, then, and look.  You knew you took out student loans for your education;  is that correct?

A.  Yes.

Q.  And you knew you would have to pay them back;  is that right?

A.  Yes.

Q.  Had it been your plan to pay them back?

A.  Yes.

Q.  And you knew that after you graduated after a certain time that would have to start, right?

A.  After six months.

Q.  Okay.  Let's talk about leaving Baptist Health Systems.  You said you were employed by Baptist Health Systems somewhere between March and September of 2002.  Tell me did you work anywhere else during that time?

A.  Just at Dawson Baptist Church in the nursery.

Q.  And what did you do there?

A.  Just childcare.

Q.  About how many hours a week did you work?

A.  It was just at night, just Wednesday and Sunday night at that time.

Q.  Okay.  Wednesday and Sunday night?

A.  Yes.

Q. So at your best week when you were working with Baptist Health Systems and you were working with Dawson, what do you think you brought home?

A. It varied because it depended on if they needed somebody or not. Some weeks they only needed me maybe one day a week. It just varied.

Q. Were there weeks that you didn't work at all for Baptist Health Systems?

A. Yes.

Q. And about how many hours were you working with Dawson on Wednesday and Sunday night?

A. Let's see, for a week it was about six at that time.

Q. And what were your wages at that time with Dawson?

A. I think it was six dollars an hour.

Q. Okay. You said when you graduated you sought work as a medical technician. Why did you have to stop working as a medical technician?

A. Because my mom was getting sick and it was best for her for me not to work.

Q. Tell the court exactly what happened in the month of September 2002 that led you to make this decision?

A. She was hospitalized and she was getting more urinary tract infections and she was losing the use of her left hand.

Q. And can you tell us what does your mother suffer from?

A. Multiple sclerosis.

Q. How long has she had that?

A. She has had it since '82 but was diagnosed in '87.

Q. Now you said she was hospitalized in 2002. Was she hospitalized more than once?

A. Yes.

Q. How many times?

A. I do not remember.

Q. You don't remember, okay.

A. Because there has been a lot.

Q. Okay. When you decided to stop working at Baptist Health Systems and you spent more time with her mother, did you continue working at Dawson?

A. Yes.

Q. Why did you continue working there?

A. Because I needed some income.

Q. So you are saying you all could not make it just on her income?

A. No.

Q. Okay. You needed more income to get through each month?

A. Yes.

Q. Why can you work at Dawson and still care for your mother?

A. Because it is only a couple of hours in the morning or a couple of hours at night.

Q. And why is that important to your mom?

A. Well, because she cannot stay by herself more than a couple of hours because she can't get up, she can't feed herself, she can't do anything for herself.

Q. Okay. So you made the decision to leave your career as a medical assistant or technician and stay at home with your mother. Was there an improvement in her health?

A. No.

Q. And was there an improvement after two months with you staying with her?

A. She wasn't as hospitalized as much in the couple of last years because mostly she was hospitalized for urinary tract infections because she can't drink.

Q. How do you help her avoid that?

A. She has to drink like three or four glasses of water a day.

Q. Okay. So you left work in 2002. When it came time for your student loans to come due, what did you do?

A. In 2002?

Q. Uh-huh.

Transcript at 24–29 (emphasis added).

### E. Ms. Rutherford's Income and Expenses

A detailed analysis of Ms. Rutherford's income and expenses is not necessary as the evidence established that her standard of living is below the poverty line.[6]

### F. Ms. Rutherford's Personal Health

Ms. Rutherford described her most recent personal health. She stated:

Q. Ms. Rutherford, if I could draw your attention back to your own personal health. Let's talk about that, okay. Tell me about your own personal health this past year.

A. Which part?

Q. Anything you would like to tell the court.

A. I had to get medical insurance because they thought I might have a neurological disease.

Q. They thought you might have possibly an inherited neurological disease?

A. Yes.

Q. Did you have tests done?

A. Yes.

Q. Did they find anything?

A. No.

Q. What were you experiencing; what caused you to go to the doctor; what were your concerns?

A. My hands were shaking. I lost a lot of weight and fatigue.

Q. What did your doctor determine was the problem?

A. It was mostly stress.

Q. Have you ever been treated for depression?

A. Yes.

Q. Are you currently on any medications?

A. Prozac.

Q. Do you regularly see a doctor for depression?

A. Just when I have to.

Q. Just when you need to, okay. How often this past year do you think you have consulted a doctor for yourself?

A. Is that dentist, too?

Q. Let's just talk about a physical or mental health provider?

A. Just maybe two or three.

Q. Do you go to regular counseling?

A. No.

Q. Why don't you go to regular counseling?

A. I can't pay for it.

Q. You can't afford it. Okay. How long have you suffered from depression? Do you remember when you were diagnosed?

A. Just recently when I went to see the doctor. Nothing else showed up.

Q. Do you think your condition has worsened in the last six months?

A. No.

---

**6.** See the outline in this Court's opinion in *In re Ivory*, 269 B.R. 890 (Bankr.N.D.Ala.2001). But if the Court were to conduct such an analysis, it surely would include the fact that the debtor does not own a car or a home. Those are in her mother's name. Conse-quently, even if Ms. Rutherford is able to improve her employment situation in the future, if she is required to pay for her own housing and transportation, it appears that her financial circumstances will worsen.

Q. It has stayed the same?

A. Yes.

Q. Okay. Do you think it worsened to the extent that you sought medical treatment?

A. For the symptoms that it was causing, yes.

Q. Okay. But you think that your depression has not worsened at this time?

A. No.

Transcript at 73–75.

## V. Contentions

The Government contends that the debtor's student loan debt is not dischargeable. The Government's primary argument is that the debtor's failure to fulfill her commitment under its Income Contingent Repayment Plan is per se bad faith.

The debtor contends she cannot pay any amount on her student loan. The debtor argues that because she has committed all of her financial, physical, and mental resources to caring for her mother, to be accountable for her student loan debt, (even at an ICRP zero payment), would be an undue hardship.

## VI. Conclusions of Law

As stated above, in *Hemar Ins. Corp. of America v. Cox,* the Court of Appeals for the Eleventh Circuit adopted the three-part test originated by the Second Circuit Court of Appeals in *Brunner v. New York State Higher Educ. Serv. Corp.* Under the *Brunner* test the debtor must prove: (1)

that she cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loan; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and, (3) that she has made a good faith effort to repay the loan.[7]

### A. The *Brunner* Factors

#### 1. *Brunner* Factor No. 1

**Based on current income and expenses, can the Debtor maintain a "minimal" standard of living for herself and her dependents if forced to repay the loans?**

The first *Brunner* factor requires the debtor to prove that she cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay her student loan. The key to that factor is of course: What is a "minimal standard of living?"[8]

This Court believes that a minimal standard of living is a measure of comfort, supported by a level of income, sufficient to pay the costs of specific items recognized by both subjective and objective criteria as basic necessities.[9] In *Ivory v. United States (In re Ivory),* 269 B.R. 890 (Bankr.N.D.Ala.2001), this Court listed the items it believes are necessary to maintain that standard of living. This Court wrote:

7. The Government almost conceded that Ms. Rutherford satisfied the first and second parts of the *Brunner* test. In its opening argument the Government explained, "Our contention is that she may possibly meet the first two standards of the Brunner test. We do not believe that she in any way, shape, or form meets the third standard in that she has made a good faith effort to repay the student loan which she obtained in January of 2002." Transcript at 8.

8. This Court addressed this issue in detail in *Ivory v. United States (In re Ivory),* 269 B.R. 890 (Bankr.N.D.Ala.2001).

9. Because the subjective evidence here is so overwhelming, the Court did not perform the objective analysis here as it did in *Ivory.*

This Court believes that a minimal standard of living in modern American society includes these elements:

A. People need shelter, shelter that must be furnished, maintained, kept clean, and free of pests. In most climates it also must be heated and cooled.

B. People need basic utilities such as electricity, water, and natural gas. People need to operate electrical lights, to cook, and to refrigerate. People need water for drinking, bathing, washing, cooking, and sewer. They need telephones to communicate.

C. People need food and personal hygiene products. They need decent clothing and footwear and the ability to clean those items when those items are dirty. They need the ability to replace them when they are worn.

Q. People need vehicles to go to work, to go to stores, and to go to doctors. They must have insurance for and the ability to buy tags for those vehicles. They must pay for gasoline. They must have the ability to pay for routine maintenance such as oil changes and tire replacements and they must be able to pay for unexpected repairs.

R. People must have health insurance or have the ability to pay for medical and dental expenses when they arise. People must have at least small amounts of life insurance or other financial savings for burials and other final expenses.

S. People must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.

*Id.* at 899.

For convenience, some courts have adopted the United States Department of Health and Human Services Poverty Guidelines as the minimal standard of living for purposes of student loan dischargeability questions. In doing so these courts recognize an annual income above or below that standard as exceeding or falling below the minimal standard of living.[10]

■ By definition poverty is, "The condition of having little or no wealth or material possessions; indigence, destitution, want."[11] In other words, it is, "Lacking the necessaries of life; in needy circumstances."[12] Clearly, if an individual lacks the necessaries of life, that individual cannot be said to be living a *minimal* standard of living.

■ In contrast, minimal means an amount, quantity, or degree that is the least possible.[13] Maybe it does not include everything an individual may want, but at least it includes the smallest degree of income necessary to cover those expense essential for daily existence. It is not, like poverty, a lifestyle lacking in necessities. It is an existence that includes making a living and earning a salary at such a level that the individual can maintain that level *and* pay a student loan. If it did not, how could a student loan ever be paid?

---

10. This Court cannot accept that a standard of living in poverty is an acceptable standard of living, below which there are levels of less comfort.

11. Oxford English Dictionary, 2nd. Ed.1989, *available at* http://dictionary.oed.com (October 19, 2001).

12. Oxford English Dictionary, 2nd. Ed.1989, *available at* http://dictionary.oed.com (October 19, 2001).

13. Oxford English Dictionary, 2nd. Ed.1989, *available at* http://dictionary.oed.com (October 19, 2001).

■ Because a "poverty" level of living and a minimal standard of living are so dissimilar, this Court does not accept that some small "current" income amount over the poverty level establishes a minimal standard of living. In the dischargeability context, an individual must be able to *maintain* a minimal standard of living before a court may require that person to pay a student loan. That decision cannot be made based simply on whether a debtor's annual income is above or below a poverty level. On the other hand, this Court does accept that these "poverty" level guidelines are helpful in comparing an individual's income and expenses to other individuals.

■ This Court continues to believe its *Ivory* test is the proper test to determine a minimal standard of living. Applying that standard, the Court finds that this debtor cannot afford the bare necessities that such a standard requires. On the other hand, even if the debtor could satisfy the *Ivory* standard, the uncontested evidence is that Ms. Rutherford *cannot even meet the lesser "poverty line" standard.*[14] Consequently, the Court finds that under both standards, the debtor cannot maintain a minimal standard of living. Therefore, the Court finds that the debtor satisfied the first *Brunner* factor.[15]

### 2. *Brunner* Factor No. 2

**Do additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans?**

■ The second *Brunner* factor asks whether there are additional circum-stances that exist which indicate the state of affairs (that is the debtor cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the loan) is likely to persist for a significant portion of the repayment period of the student loan. Clearly there are such circumstances here.

The debtor's income is insufficient to support a minimal lifestyle or to pay for simple necessities. She is living "hand-to-mouth" and has been for many years. Financially, the future promises no better. While Ms. Rutherford has some special skills which might qualify her for more lucrative paying jobs, if she were living alone without her mother's assistance, she would be solely responsible for housing, transportation, and associated expenses. And as the evidence demonstrated, Ms. Rutherford's medical assistant's certification has expired and she could not speculate if she would be able to become certified in the future.

■ In addition, as the discussion below demonstrates, Ms. Rutherford is committed to caring for her mother. In contrast to the Government's argument, this Court believes that it should consider that commitment and Ms. Rutherford's relationship with her mother when it considers whether Ms. Rutherford's circumstances will continue for a significant period and whether Ms. Rutherford's actions are in good faith. That of course is the third

14. Because this debtor cannot even meet the lessor "poverty line" test, the Court has not discussed the *Ivory* test in detail.

15. The evidence is clear that even if the Court considers the debtor's mother's income in determining whether the debtor can maintain a minimal standard of living, the answer is again, no. And as the discussion below demonstrates, because the debtor's mother is so dependent on the debtor, the debtor's circumstances are even more dire.

*Brunner* factor.[16] But for now, the Court finds that the debtor satisfied the second *Brunner* factor.

### 3. *Brunner* Factor No. 3

### Has the Debtor made good faith efforts to repay the loans?

■ The parties agree that the debtor has not made the payments required of her. The immediate question is: Why? The obvious, and probably the most reasonable and certainly efficient answer is, Ms. Rutherford is so poor that she cannot pay the debt. Another answer, the one favored by the Government, is that Ms. Rutherford is acting in bad faith. A third, and probably the most responsible answer is, Ms. Rutherford's actions, because of he relationship with her mother, demonstrate a good faith effort. All three are discussed below.

### a. Poverty

■ It is clear to this Court that whether Ms. Rutherford lives with her mother or not, or whether Ms. Rutherford's mother has her own income or not, or whether Ms. Rutherford's mother assists the debtor with her expenses or not—if Ms. Rutherford lives below the poverty line, as the Government substantiates, she does not have money to pay her student loan. Is being poor bad faith? Surely not. If Ms. Rutherford does not have enough money to pay the student loan, she cannot be considered to be acting in bad faith if she does not pay that loan. This logical conclusion alone supports dischargeability.

### b. Bad Faith and the Income Contingent Repayment Plan

■ But the Government contends that Ms. Rutherford may not rely on an inability to pay to demonstrate good faith because she accepted the Government's offer to participate in its Income Contingent Repayment Plan.[17] That plan, the Government argues, allows a debtor such as Ms. Rutherford to make no payments during the repayment period of her loan if she does not have income to make payments. The Government concludes that the debtor cannot then demonstrate "undue hardship" because there is no hardship by paying nothing. Other courts have considered, and rejected, a per se application of this position argument. This Court agrees with them.

The court in *Korhonen v. United States Department of Education, (In re Korhonen),* 296 B.R. 492 (Bkrtcy.D.Minn.2003) explained:

> The defendants only real argument is based on the Income Contingency Repayment Plan. The defendants' argument is nothing less than a per se rule that there can never be a discharge of a student loan for an undue hardship where the debtor is eligible for the Income Contingent Repayment Plan. This cannot be right. The Income Contingent Repayment Plan cannot trump the Congressionally mandated individualized determination of undue hardship. The Income Contingent Repayment Plan is but one factor to be considered in determining undue hardship, but it is not determinative. See *In re Grawey,* 2001

---

**16.** See *Educational Credit Management Corp. v. Polleys (In re Polleys),* 356 F.3d 1302 (10th Cir.2004) and *Nys v. Educational Credit Management Corporation (In re Nys),* 308 B.R. 436 (9th Cir. BAP 2004) for discussions of recent interpretations of this factor.

**17.** Initially, the Court must question whether the third *Brunner* factor is a measure of *past or future* performance. The standard is, *has* the debtor made a good faith effort, not *will* she. The ICRP appears to be geared toward the latter.

WL 34076376, at *4 [(Bankr.C.D.Ill. Oct. 11, 2001)]; *In re Leahy*, 2001 WL 34079569, at *2 [(Bankr.C.D.Ill. June 28, 2001)]; *In re Herrmann*, 2000 WL 33961388, at *3 (Bankr.C.D.Ill.[Feb. 7, 2000]).

The Income Contingent Repayment Plan is not always a feasible option. It permits negative amortization; a borrower can be in the program for twenty five years or more; and even if the remaining loan balance is cancelled when the borrower completes the program without full repayment, the unpaid amount including interest is then treated as taxable income to the borrower, which may result in a large amount of nondischargeable tax debt. *In re Grawey*, 2001 WL 34076376, at *4 (citing *In re Thomsen*, 234 B.R. [506] at 509–510 [(Bankr.D.Mont. June 7, 1999)]). In addition, even a debtor who pays little or nothing on student loans under the Income Contingent Repayment Plan will carry the every increasing debt for the better part of his life, eliminating or severely curtailing the debtor's ability to incur credit in an increasingly credit driven economy.

*Id.* at 496–97.

The court concludes:

Unlike the Income Contingent Repayment Plan, bankruptcy relief is designed to give the honest but unfortunate debtor a fresh start, and although government guaranteed student loans are meant to be more difficult to discharge than general unsecured debts, they are not meant to be impossible to discharge.

*Id.* This debtor is exactly the type of individual that the undue hardship discharge provision was devised to benefit.

*Id.* at 497.

Numerous courts agree with the above analysis.[18] So does this Court. The ICRP is one factor to consider in deciding the dischargeability of student loans.[19] Until told otherwise, this Court will apply the general standard adopted by the Court of Appeals for the Eleventh Circuit in *Hemar Ins. Corp. of Am. v. Cox* to determine undue hardship.

### c. Good Faith Attempt and Ms. Rutherford's Relationship with Her Mother

█ In its opening argument, the Government raised the question of whether the debtor's care for her mother may be relevant under the third *Brunner* factor. Under its ICRP argument that the debtor would not make any payment unless her standard of living rose above the poverty line, the Government surmised, "The way I understand it is she doesn't anticipate getting to that level **as long as she has to care for her mother.**" Transcript at 10 (emphasis added). And when recognizing the pecuniary predicament Ms. Rutherford's mother creates for the debtor, the Government identified what this Court has come to recognize as one of the defining elements in this proceeding, that is, "**if Mom's income is not there, she [the debtor] is a full-time employee and can work.**" Transcript at 20 (parenthetical added) (emphasis added).

**18.** *Fahrer v. Sallie Mae Servicing Corp., et al. (In re Fahrer)*, 308 B.R. 27 (Bankr.W.D.Mo. 2004); *Nanton–Marie, Plaintiff, v. United States Department of Education, et al. (In re Nanton–Marie)*, 303 B.R. 228 (Bkrtcy.S.D.Fla. 2003); *Strand v. Sallie Mae Servicing Corporation, et al. (In re Strand)*, 298 B.R. 367 (Bkrtcy.D.Minn.2003); *Alston v. U.S. Department of Education, et al. (In re Alston)*, 297 B.R. 410 (Bkrtcy.E.D.Pa.2003).

**19.** This debtor actually enrolled in the ICRP when she applied for the loan consolidation. The Court does not find that to be a distinguishing factor.

The real question then is: Can Mrs. Rutherford be dependent on the debtor but not be a dependent of the debtor? In this case, she cannot.[20]

Dependancy in the Bankruptcy Code context is not limited to financial dependancy. That is particularly true where, like the instant situation, the debtor's mother is entirely dependent on her daughter for indirect financial assistance. That was the situation and holding in *In re Collopy,* 99 B.R. 384 (Bankr.S.D.Ohio 1989) and similar cases where courts considered whether particular persons were dependents for purposes of state or federal exemption statutes.

The court in *In re Peacock,* 292 B.R. 593 (Bkrtcy.S.D.Ohio 2002) summarized the facts from *Collopy.* Referring to the *Collopy* court, the *Peacock* court stated:

> Judge Perlman interpreted the term "dependent" broadly, holding that it may encompass certain relationships in which there is no direct financial dependency between the parties. There, the debtor sought to exempt the cash surrender value of a life insurance policy in which her mother was named beneficiary. The parties agreed that the debtor's mother was not financially dependent upon the debtor, but that she was entirely dependent upon her daughter "in a physical sense, for the daughter provide[d] transportation for marketing, banking and medical attention." *Id.* at 384 (quoting *Collopy*). It was necessary for the debtor to provide these services because her mother suffered from glaucoma. The court concluded that it was "a fair inference that the purpose of the

life insurance policy [was] to make some provision for the physical needs of the mother in the event that debtor should predecease her." *Id.* (quoting *Collopy*). *Id.* at 597.[21]

Recognizing the importance of *Collopy* and relying on two similar cases, (*In re Tracey,* 66 B.R. 63 (Bankr.D.Md.1986) and *In Re Dunbar,* 99 B.R. 320 (Bankr. M.D.La.1989)), the court in *In re Rigdon,* 133 B.R. 460 (Bkrtcy.S.D.Ill.1991) adopted this definition of dependent.[22] It reads, "With this in mind, the Court holds that a 'dependent,' for purposes of § 12–1001 of the Illinois Code of Civil Procedure, is **an individual who is supported financially, either directly or indirectly by another, and who reasonably relies on such support.** This is a broad definition, and a factual finding of dependency will thus have to be made, after a hearing, on a case by case basis." *Id.* at 465 (emphasis added). The court continued:

> The definition of "dependent" this Court adheres to is not necessarily inconsistent with the decision in *Collopy.* **In *Collopy,* the beneficiary–mother was not presently financially dependent on her debtor-daughter. The daughter, however, was providing her mother with vital services.** *If the daughter did not provide those services, the mother would have had to hire someone else to perform them.* **That was the purpose of the life insurance the daughter obtained. If the daughter predeceased her mother, then the life insurance proceeds could be used to hire someone to provide the mother with those necessary services. Consequently, the mother was indi-**

**20.** As the discussion below demonstrates, a debtor may provide indirect financial assistance to a dependent.

**21.** The *Peacock* court agreed with the *Collopy* holding but distinguished it on the facts.

**22.** The issue in *Tracey* was whether the debtor's 72 year old mother was a dependent of the debtor.

rectly financially **dependent on her daughter, and the *Collopy* court recognized this and allowed the daughter's claimed exemption of the life insurance policy.**

While the issue in *Collopy* is not before this Court and, therefore, this Court makes no decision with regard to that type of situation, *Collopy* is important for two reasons. First, it is another case in which a broad definition of "dependent" is used. Second, it shows that, despite the use of a broad definition of "dependent," there is still some financial underpinning or basis to the definition. *Collopy* does not drift off into a definition of "dependent" which includes such nonmonetary items as guidance, love, and companionship.

*Id.* at 466 (emphasis added).

Relying on *In re Sommer*, 228 B.R. 674 (Bankr.C.D.Ill.1998), the court in *In re Rieker*, Case No. 00–81496, 2001 WL 34076048 (Bankr.C.D.Ill. Aug. 22, 2001), adopted the *Rigdon* standard and added, "Among the factors which may be appropriate to consider are the person's age; their health and any special needs; their present income and ability to work; their

assets and liabilities; and the percentage of their income that the support in question constitutes." *Id.* at *2.[23]

Based on the above, the Court finds that Ms. Rutherford's mother is a dependent of the debtor for purposes of the *Brunner* test, and in particular for purposes of factors two and three.[24] Ms. Rutherford provides both significant indirect financial assistance and irreplaceable non-financial assistance, to her mother. Because she does, it is abundantly clear first that Ms. Rutherford's dire financial situation will continue through out her mother's life, (estimated to be another twenty years). In addition, because of that situation, Ms. Rutherford does not have the present ability, and will not have a future ability, to pay her student loan. This Court cannot find that Ms. Rutherford is acting in bad faith in either regard.

On the other hand, should this Court review Ms. Rutherford's "choice" to care for her mother rather than to leave her mother, and maybe make more money, and maybe pay student loan? Maybe. But if it does, what criteria should it employ? In *Ivory* this Court wrote:

require a parent to provide support for a child who has reached the age of majority. *Whitten v. Whitten*, 592 So.2d 183 (Ala. 1991). However, there are two exceptions to the general rule: (1) when an adult child is so mentally or physically disabled that he cannot support himself, *Ex parte Brewington*, 445 So.2d 294 (Ala.1983), and (2) when application for post-minority educational support is made before the child reaches the age of majority. *Ex parte Bayliss*, 550 So.2d 986 (Ala.1989)." 763 So.2d at 252. *Id.* at 255 (quoting *Cohen v. Baker*, 763 So.2d 248 (Ala.Civ.App.1998), *rev'd on other grounds*).

**23.** Like other courts, this court recognizes that "dependent" is not defined in the Bankruptcy Code. And like other courts this Court has considered its state courts' pronouncements on the meaning of dependent. In Alabama, the state courts have consistently adopted a broad definition. In *DeMo v. DeMo*, 679 So.2d 265 (Ala.Civ.App.1996), the court concluded, relying on *Ex parte Brewington*, 445 So.2d 294, 297 (Ala.1983), that, "the words 'child' and 'children' in Rule 32 refer to dependent children, including both minor children as well as adult children who continue to be disabled beyond their majority." *Id.* at 267. And the court in *Ex parte Cohen*, 763 So.2d 253 (Ala.1999) later wrote:

The Court of Civil Appeals accurately stated the general rule concerning postminority support: "In Alabama, the general rule is that a trial court has no jurisdiction to

**24.** Even if the debtor's mother is not a dependent of the debtor, the evidence in this case is overwhelming that the debtor has satisfied her burdens under the *Brunner* test.

It has been asked, "Can't everyone pay just a little?" That question may be answered, "A debtor's ability to pay is a function of the level of sacrifice demanded." Teresa A. Sullivan, et al., *As We Forgive Our Debtors* 200 (1989).

Applying this sobering hypothesis, clearly the direct answer to the question is yes, everyone can pay something.[25] But, as a society we have decided that we are not going to demand certain levels of sacrifice, *at least with regard to payment of student* loans. We are not going to require an individual to pay a student loan if that person cannot maintain a minimal standard of living. The reasoning lies in the structure of the Bankruptcy Code.

Most of the debts designated in section 523 of the Bankruptcy Code as "non-dischargeable" are simply that— not dischargeable under *any* circumstances. Student loan debts are an exception; their "nondischargeability" is *qualified.* A student loan *may* be discharged if excepting it from discharge would impose an "undue hardship" on the debtor.

Yes, everyone may be able to squeeze out a few "bucks" here and there, but neither Congress nor the *Brunner* court intended the price of a student loan discharge to be deprivation of basic needs. Demanding a sacrifice of that nature would be contrary to the Bankruptcy Code and at a minimum would thwart the congressional intent of section 523(a)(8)—that is, it could prevent student loans from ever being discharged.

This interpretation fits with the *Brunner* court's three-part test. A "hardship" that is "undue" is a condition, "which presses unusually hard upon one who has to endure it" and is beyond what is appropriate, warranted, or natural.[26] A person who earns enough *only* to supply himself or herself with the means to survive and make a living, (and is not lacking in necessities), cannot pay *any* additional debt without suffering "undue hardship."

Clearly Congress did not intend, and the *Brunner* court did not recognize, that *given the appropriate level of sacrifice,* everyone has some "ability," to make some payment on a student loan. A person faced with the responsibility to pay a debt may be required to tighten his or her belt, but not so tight to cut off blood supply.[27]

*Ivory,* 269 B.R. at 912–13.

Some people are confined by such difficult situations that without dramatic change, they have no prospects of overcoming those difficulties. That is the situation here. There is no indication that Ms. Rutherford's situation will ever change, at least not for twenty years. She clearly does not have an ability to pay her student loan debt and it is apparent she will not

---

**25.** Ideally, a budget that reflects a minimal lifestyle does not contain anything unnecessary. In terms of a minimal standard of living, unnecessary could mean one of two things: (1) that is money is spent on something that is never necessary; or, (2) that *too much* is spent on something that *is* necessary. Clearly, a person with a student loan debt who can afford a minimal standard of living, but has money left over, should pay that debt. But what that person may purchase before reserves are *allowed* to accumulate, is of course what defines a minimal standard of living.

**26.** Oxford English Dictionary, 2nd. Ed.1989, *available at http://dictionary.oed.com* (October 19, 2001).

**27.** This Court has not addressed the issue of a partial discharge. See *Hemar Ins. Corp. of America v. Cox,* 338 F.3d at 1242–43 for a discussion of that issue.

have that ability for some time. Should that be held against her? This Court believes not. There is no evidence that Ms. Rutherford's failure to pay her loan is the result of "bad faith." Instead, the evidence indicates that Ms. Rutherford failed to pay her loan because she did not have any money. The reasons she does not have any money are equally supported by the evidence. Based on the above, the Court finds that the debtor satisfied the third *Brunner* factor.

## B. Conclusion to *Brunner* Factors

Ms. Rutherford cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependent if forced to repay the loan. Additional circumstances exist indicating that Ms. Rutherford's state of affairs is likely to persist for a significant portion of the repayment period of the student loan. Ms. Rutherford has made a good faith effort to repay the loan. Consequently, excepting Ms. Rutherford's student loan debt from her discharge in this case will impose an undue hardship on her and her dependent. This student loan should be discharged.

## VII. Conclusion

Based on the debtor's satisfaction of the *Brunner* factors, the Court concludes that excepting Ms. Rutherford's student loan debt from her discharge will impose an undue hardship on her and her dependent. Ms. Rutherford has done enough and is entitled to a discharge that includes her student loan.[28] This Court will not demand any further sacrifice by holding the debtor's student loan over her head until her mother dies.

---

28. In reaching its findings of fact and conclusions of law, the Court relies on its opinions in *Halverson v. Pennsylvania Higher Education Assistance Agency (In re Halverson),* 189 B.R. 840 (Bankr.N.D.Ala.1995); *O'Flaherty v. Nellie Mae, Inc. (In re O'Flaherty),* 204

A separate order will be entered in conformity with this memorandum opinion.

### *ORDER*

In conformity with and pursuant to the Memorandum Opinion entered contemporaneously herewith, it is **ORDERED, ADJUDGED AND DECREED** that:

1. Judgment is entered in favor of the Plaintiff and against the Defendant;

2. The debt that is the subject of the Complaint is DISCHARGEABLE in this bankruptcy case.

B.R. 793 (Bankr.N.D.Ala.1997); and *In re White,* 243 B.R. 498 (Bankr.N.D.Ala.1999) *reh'g denied* 243 B.R. 515 (Bankr.N.D.Ala. 1999) and *In re Ivory,* 269 B.R. 890 (Bankr. N.D.Ala.2001).