In re John Frank McLANEY, Robin P. McLaney, Debtors.

John Frank McLaney and Robin P. McLaney, Plaintiffs,

v.

Kentucky Higher Education Assistance Authority, Defendant.

Bankruptcy No. 03–10251–DHW.

Adversary No. 03–1122–DHW.

United States Bankruptcy Court, M.D. Alabama.

Sept. 10, 2004.

Ray T. Kennington, Ozark, AL, Attorney for Debtor.

William McCollum Halcomb, Birmingham, AL, Attorney for Creditor.

## MEMORANDUM OPINION

DWIGHT H. WILLIAMS, JR., Bankruptcy Judge.

John Frank and Robin P. McLaney filed a complaint on October 21, 2003 to determine the dischargeability of their student loan debts to Kentucky Higher Education Assistance Authority ("KHEAA").[1] Trial was held in Dothan, Alabama on July 14, 2004. Ray T. Kennington represented the McLaneys; William M. Halcomb represented KHEAA.

### Jurisdiction

The court's jurisdiction in this adversary proceeding is derived from 28 U.S.C. § 1334 and the United States District Court for this district's general order of reference of title 11 matters. Because this proceeding seeks to determine the dischargeability of particular debts, it is a core proceeding under 28 U.S.C. § 157(b)(2)(I) thereby extending this court's jurisdiction to the entry of a final order or judgment.

### Findings of Fact

John Frank McLaney earned a bachelors degree in computer information systems from Troy State University at Dothan in March of 1999. The cost of his education was financed by KHEAA loans.

While he attended Troy State, Mr. McLaney worked for Phillips Van Husen as a Clerk II earning about $6.80 per hour. In August 1999 he took a job with Five Star Federal Credit Union as a network administrator earning around $10.13 per hour. He resigned in January 2001 and was rehired the next month by Phillips Van Husen as a print shop technician earning $9.47 per hour.

Mr. McLaney is in poor health. He suffers from Addison's disease, hypertension, high cholesterol, nerve damage, and type I diabetes. His diabetic condition requires that he wear an insulin pump to regulate his blood sugar level. Mr. McLaney usually visits his physician at least once every calendar quarter. The McLaney family has medical insurance coverage through his employer which pays 80% of their medical expenses exclusive of prescription drugs. Some of their prescription drug costs are covered by insurance but only after the McLaneys pay a per prescription deductible.

Robin P. McLaney earned a bachelors degree in English from Troy State University at Dothan in 1996. Like her husband, Ms. McLaney's education was financed by KHEAA.

Ms. McLaney is currently employed by Harvest Freewill Baptist Church School teaching English to 7th through 12th graders. Her net income from this employment is $200 per week. In addition, Ms. McLaney works an average of eight hours each week for Phillips Van Husen. Neither of these jobs offers any additional employee benefits.

Ms. McLaney has fibromyalgia for which she is under the care of a physician

---

**1.** The McLaneys filed their chapter 7 bankruptcy case on February 4, 2003.

and for which she takes prescription medication.

The McLaneys have one dependent child. Their fifteen year-old son is a high school student.

The McLaneys' net income is currently $2,253.19 per month.[2] Their current monthly expenses total $2,111.00.[3] Therefore, their disposable income is $142.19 per month.

There is little, if any, equity in the McLaneys' home. The note secured by their home has a remaining term of approximately 22 years. The McLaneys have two vehicles, both of which have high mileage. They have paid for the 1998 Mazda which has about 225,000 miles. They will complete payments on the 1996 Nissan in about one year. The Nissan has 135,000 miles.

Tithing is not a requirement for continued membership in their church. However, the McLaneys historically have made volitional contributions as reflected by their tax returns for past years. Charitable contributions were $4,792 in 2000 (20% of AGI), $3,870 in 2001 (14% of AGI), $5,118 in 2002 (15% of AGI), and $3,895 in 2003 (13% of AGI).

Together the McLaneys owe KHEAA $26,647.35 on their various student loans. John McLaney owes $15,360.77, and Robin McLaney owes $11,286.58. Although the record does not reflect the amount previously paid on the loans, Ms. McLaney testified that they made a few payments whenever they were able to do so.

Payments were to have commenced six months after graduation. Robin McLaney graduated in 1996;[4] John McLaney graduated in 1999. The notes provide for a repayment term of five years but not more than 10 years.[5] Assuming a 10–year term,

2. Total net income for the family (Plaintiff's Exhibit 3) is calculated as follows:

John McLaney earns $258 net per week from Phillips Van Husen, but he misses work approximately five days per year due to illness and is not compensated for the days absent. Hence, Mr. McLaney's net income is $258 net per week for 51 weeks or $13,158 annually which translates to $1,096.50 net per month.

Robin McLaney earns $200 net per week from Harvest Freewill Baptist Church School and $66.93 net per week from Phillips Van Husen. Hence, Ms. McLaney's net income is $266.93 net per week for 52 weeks or $13,880.36 annually which translates to $1,156.69 net per month.

3. Plaintiff's Exhibit 2 reflects monthly expenses of $2,036, but the expenses are totaled incorrectly. Exhibit 2 actually totals $2011. At trial Ms. McLaney testified that their medical expenses have increased by $100 per month since the bankruptcy petition was filed in February 2003. Therefore, the current monthly expenses are these:

| | |
|---|---:|
| Water | $ 38.00 |
| Home mortgage | 348.00 |
| Electric utilities | 100.00 |
| Auto insurance | 60.00 |
| Telephone | 50.00 |
| Life insurance | 50.00 |
| Cable television | 60.00 |
| Cellular telephone | 65.00 |
| Auto payment | 120.00 |
| Religious tithe | 220.00 |
| Gasoline | 100.00 |
| Food | 350.00 |
| Medical | 350.00 |
| Other (includes unexpected contingency allowances for home and auto maintenance and repair) | 200.00 |
| TOTAL | $2,111.00 |

4. The month of her graduation is not a part of the record.

5. The exact language of the note provides:

I am obligated to repay the full amount of the loan(s) and accrued interest. Federal Stafford Loans have a repayment grace period, usually six months after I end enrollment as at least a half-time student at an eligible school. My grace period will be disclosed in my disclosure statement.

I will repay the principal of my loan(s) in periodic installments during a repayment period(s) that begins on the day immediately following the end of my grace period. My principal repayment period for each

John McLaney's repayment term will end in October 2009. Robin McLaney's repayment term will end sometime in 2006 or 2007.

There are 58 months from August 2004 to October 2009. If the McLaneys begin making payments in August 2004, a monthly payment of $509.04 would be required to pay the $26,647 balance on the loans, together with interest at 4.25%, by October 2009.

Although the McLaneys have not done so, they could elect to participate in a Federal Direct Consolidation Loan. Under this program, their student loan indebtedness would be refinanced and payments extended under a new 10 or 20–year term. A 10–year term would require payments of $272.97 per month, and a 20–year term would require payments of $165.01 per month. *See* Defendant's Exhibit 2.

The United States Department of Health and Human Services has promulgated guidelines to measure poverty. *Federal Register,* Vol. 69, No. 30, February 13, 2004, pp. 7336–7338. The poverty threshold income for a family of three is $15,670. *See* Defendant's Exhibit 1.

### Conclusions of Law

Ordinarily, student loan debts are not dischargeable in bankruptcy. An exception to this rule exists when the repayment of the student loan would result in an undue hardship for the debtor and the debtor's dependents.[6]

The phrase "undue hardship" is not defined by the Bankruptcy Code. Recently, in *Hemar Insurance Corporation of America v. Cox (In re Cox),* 338 F.3d 1238 (11th Cir.2003), the court of appeals for this circuit adopted the three-part test for determining undue hardship originally announced by the Second Circuit in *Brunner v. New York State Higher Education Services Corp.,* 831 F.2d 395 (2nd Cir.1987). The *Brunner* test for "undue hardship" requires the debtor to show:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Cox,* 338 F.3d at 1241 (quoting *Brunner,* 831 F.2d at 396).

### Brunner Test's First Prong:  Minimal Living Standard

The first prong of the *Brunner* test requires the court to consider the debtors' current income and expenses to determine whether they can maintain a minimal standard of living if required to repay the student loan. While there is no precise definition of the phrase "minimal

---

loan generally lasts five years but may not exceed 10 years, exclusive of any period of deferment or forbearance.

Defendant's Exhibit 4–2 contains this language which is typical of the language found in all of the McLaneys' notes.

**6.** The statute provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—...

(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C. § 523(a)(8).

standard of living," that standard does not condemn the debtors to a life of abject poverty. *Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish),* 72 F.3d 298, 305 (3rd Cir.1995). On the other hand, the mere fact that repayment of the student loan would be difficult for the debtors is not enough to result in the discharge of the debt. *Faish,* 72 F.3d at 306–07; *United Student Aid Funds, Inc. v. Nascimento (In re Nascimento),* 241 B.R. 440, 445 (9th Cir. BAP 1999). In short, the hardship of repayment must be undue. Therefore, a minimal standard of living lies somewhere between poverty and mere difficulty. In order to make this determination the court must examine the debtors' income and reasonable expenses in light of their particular circumstances to determine whether repayment would impose an undue hardship. *Ivory v. United States (In re Ivory),* 269 B.R. 890 (Bankr. N.D.Ala.2001).

The $142.19 disposable income of the debtors is far short of the $509.04 needed to repay the student loans by October 2009. KHEAA does not contend that the debtors are underemployed or that they are in any other way failing to maximize their income. Rather, KHEAA's contention is that certain of their expenses are unreasonable, and that if those expenses were reduced or eliminated, they would be able to repay the indebtedness without the imposition of an undue hardship.

In particular KHEAA challenges the reasonableness of the budgeted expenses for 1) cable television of $65 per month, 2) cellular telephone service of $50 per month, 3) life insurance premiums of $60 per month, and 4) charitable donations of $220 per month.

■ This court recognizes that it is unnecessary and even inappropriate to go through the debtors' budget line by line in order to wring out all possible surplus where the expenses are minimal. *Cline v. Illinois Student Loan Assistance Ass'n (In re Cline),* 248 B.R. 347 (8th Cir. BAP 2000). In analyzing the reasonableness of their expenses the court does so against the backdrop of what appears to be an austere and even understated expense budget. For example, the debtors have no budgeted expenses for clothing, laundry and dry cleaning, or recreation. Further, their budget for food is a meager $350 per month for a family of three,[7] and their home mortgage payment of $348 per month is likely less than they would pay to rent elsewhere. Finally, the debtors require two vehicles in order to travel to and from their respective jobs. Both vehicles are older models, and both have high mileage. The court would expect that their current $120 per month expenditure for the purchase of an automobile will dramatically increase in the near future when these vehicles need replacing.

■ The court concludes that the budgeted expenses for cable television, cellular telephone services, and life insurance premiums are reasonable under the circumstances. As noted, the McLaneys have not budgeted for recreation expenses. Under the minimal standard of living test, "[p]eople must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet." *In re Ivory,* 269 B.R. at 899. It is not unreasonable for the McLaneys to pay $65 per month for cable television particularly because they have no expenses for any other form of recreation.

---

7. Assuming that all three persons enjoy three meals a day, then each meal must cost the McLaneys no more than $1.30.

■ Neither is it unreasonable for the McLaneys to pay $50 per month for cellular telephone service. This service covers two telephones. One of the telephones is used by Ms. McLaney and the other is used by their teenaged son. As a safety precaution for a woman who works part-time in the evenings or for working parents to maintain contact with a child, $50 a month for cellular telephone service is not unreasonable.

■ The $60 per month expense for life insurance premiums is also not unreasonable. "People must have at least small amounts of life insurance or other financial savings for burials and other final expenses." *In re Ivory*, 269 B.R. at 899. Here, Mr. McLaney is in poor health suffering from a number of potentially serious illnesses. Under these circumstances, it is not unreasonable to expend $60 each month for life insurance that would cover funeral expenses and provide some small cushion for his family against the loss of his income in the event of his demise.

The more difficult issue is whether the budgeted expense of $220 per month for charitable contributions, a tithe to their church, is reasonable. Courts are divided on the issue.

■ At the heart of the debate is the effect of the Religious Liberty and Charitable Donation Protection Act of 1998, Pub.L. No. 105–183, 112 Stat. 517, 519 ("RLCDPA") in a student loan dischargeability proceeding. This Act amended title 11 in a number of instances. First, the Act amended sections 544 and 548 so as to insulate from a trustee's avoidance powers certain charitable contributions to qualified religious and charitable entities.[8] Second, the Act amended section 707(b) to restrict a court from considering the debtor's charitable giving in making determinations of dismissal for substantial abuse.[9] Third,

---

8. 11 U.S.C. § 544(b) now provides:
   (b)(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.
   (2) Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2)). Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.
   11 U.S.C. § 548(a)(2) now provides:
   (a)(2) A transfer of a charitable contribution to a qualified religious or charitable entity or organization shall not be considered to be a transfer covered under paragraph (1)(B) in any case in which—
   (A) the amount of that contribution does not exceed 15 percent of the gross annual income of the debtor for the year in which the transfer of the contribution is made; or
   (B) the contribution made by a debtor exceeded the percentage amount of gross annual income specified in subparagraph (A), if the transfer was consistent with practices of the debtor in making charitable contributions.

9. The statute covering dismissal for substantial abuse provides:
   (b) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor. In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of "char-

the Act amended section 1325 to allow certain charitable contribution expenses in the calculation of a debtor's disposable income.[10]

However, the RLCDPA did not amend 11 U.S.C. § 523(a)(8). Courts draw different conclusions from the absence of such an amendment expressly insulating charitable contributions in the context of an undue hardship determination.

For instance, one court adopted a *per se* rule holding that the RLCDPA's failure to amend section 523(a)(8) means that charitable contributions are never an allowable expense in determining a debtor's ability to repay a student loan. *See Ritchie v. Northwest Education Loan Ass'n (In re Ritchie)*, 254 B.R. 913, 919 (Bankr.D.Id. 2000). The *Ritchie* court reasoned that, because Congress insulated charitable contributions in some contexts but not others, Congress did not intend to insulate charitable contributions in the sections not amended.

Another court held that a debtor's tithes may be considered in some circumstances as an appropriate expense in an undue hardship determination. *See Educational Credit Management Corp. v. McLeroy (In re McLeroy)*, 250 B.R. 872, 879–80

(N.D.Tex.2000); *Meling v. United States (In re Meling)*, 263 B.R. 275 (Bankr. N.D.Iowa 2001)(rejecting the idea of a *per se* rule excluding charitable contributions as allowable expenses in § 523(a)(8) proceedings).

Another court, while not specifically addressing the effect of the RLCDPA, held that a charitable contribution of $60 per month was a reasonable and necessary expense of the debtors and was properly counted in their expenses to determine undue hardship. *Lebovits v. Chase Manhattan Bank (In re Lebovits)*, 223 B.R. 265 (Bankr.E.D.N.Y.1998).

This court agrees with the reasoning expressed in *McLeroy* that the absence of an amendment to 11 U.S.C. § 523(a)(8) does not result in a *per se* exclusion of charitable contributions in determining undue hardship.[11] What then, is the appropriate standard to employ?

In a number of instances and for various purposes bankruptcy courts are required to determine a debtor's disposable income. For example, if the trustee or a creditor objects to a proposed chapter 13 plan, the debtor must pay all of his disposable income under the plan for at least three years in order for the plan to be con-

---

itable contribution") under section 548(d)(3) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).
11 U.S.C. § 707(b).

**10.** In relevant part 11 U.S.C. § 1325 provides:
(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—
(A) for the maintenance or support of the debtor or a dependent of the debtor, including charitable contributions (that meet the definition of "charitable contribution") under section 548(d)(3) to a *qualified religious or charitable entity or organization* (as that term is defined in

section 548(d)(4)) in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made . . .
11 U.S.C. § 1325(b)(2)(A).

**11.** To conclude otherwise would be tantamount to "writing in" to the statute an exclusion which the statute does not contain, and that in the face of the express intent of Congress to insulate such contributions in the other bankruptcy contexts in which Congress has addressed the issue. The absence of an amendment *insulating charitable contributions in the undue hardship context would be significant only if the statute expressly excluded them. It did not and does not.

firmed. 11 U.S.C. § 1325(b)(1)(B). Disposable income is defined at 11 U.S.C. § 1325(b)(2) as "income which is not reasonably necessary to be expended ... for the maintenance or support of the debtor or a dependent of the debtor." Charitable giving within the limits of 11 U.S.C. § 548(d) is considered "reasonably necessary." *Id.*

Similarly, a chapter 7 case may be dismissed for substantial abuse under 11 U.S.C. § 707. Courts have determined that a debtor's ability to repay debts is a primary factor in determining whether chapter 7 relief would constitute substantial abuse. *Price v. United States Trustee (In re Price)*, 353 F.3d 1135, 1140 (9th Cir.2004); *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir.2004); *Stewart v. United States Trustee (In re Stewart)*, 175 F.3d 796, 808 (10th Cir.1999); *In re Leung*, 311 B.R. 626, 630 (Bankr.S.D.Fla. 2004). Therefore, the courts must necessarily consider the debtor's disposable income. Charitable donations within the limits of § 548(a)(2) are allowable expenses under a § 707(b) analysis.

■ Because a determination of disposable income is a component of the undue hardship analysis of § 523(a)(8), the plan confirmation requirement of § 1325(b), and the substantial abuse analysis of § 707(b), rules of statutory construction require that disposable income be computed in the same manner:

> Provisions in one act which are omitted in another on the same subject matter will be applied when the purposes of the two acts are consistent. Prior statutes relating to the same subject matter are compared with the new provision; if it is possible by reasonable construction, both are construed so that the effect is given to every provision in all of them. It is also possible to refer to subsequent enactments and amendments as an aid in arriving at a correct interpretation. 2B Norman J. Singer, *Sutherland Statutes and Statutory Construction* § 51:2 (6th ed.2004). Therefore, the court concludes that bona fide charitable giving that is within the parameters of § 548(a)(2) is an allowable expense in calculating disposable income for purposes of determining undue hardship under 11 U.S.C. § 523(a)(8).

■ In the case at bar the debtors have a long history of consistent charitable giving. There is not a shred of evidence that their charitable giving expense was contrived for the purpose of discharging their student loans under the undue hardship exception. The court holds that where, as here, the debtors have a consistent history of bona fide charitable giving that is within the parameters of § 548(a)(2), those donations may be considered within the debtors' reasonably necessary expenses under § 523(a)(8). With a disposable income of only $142.19 per month the debtors lack the ability to repay the student loan obligation, which would require a payment of $509.04 per month.

### *Brunner* Test's Second Prong: Persistent Circumstances

■ Although the evidence touching on the second prong of the *Brunner* test is meager, the court concludes from the evidence that the debtors' current situation is likely to continue for the foreseeable future. KHEAA does not contend that the debtors are underemployed or that they have prospects for larger incomes in the future. Indeed, Ms. McLaney is currently working two jobs. Further, the generally poor health of these debtors restricts their earning potential and increases their expenses. Finally, the debtors' vehicles have high mileage and will soon need to be replaced only adding to their monthly expense. In short, the court concludes that

the debtors' income is not likely to significantly increase in the foreseeable future, but their expenses will only continue to rise. Hence, the debtors have met their burden of proof under the second prong of the *Brunner* test.

### *Brunner* Test's Third Prong: Prior Good Faith Effort To Repay

 Under the *Brunner* test, the debtors must prove that they have made a good faith effort to repay their student loans. The McLaneys admit that they have made only a few monthly payments on this indebtedness. However, they contend that they did pay whenever they could afford to do so. The evidence supports their contention. During the entire repayment period of these loans, the debtors' income and expenses have approximately remained the same. The court finds that the McLaneys had no greater ability in the past to repay these loans than they have currently.

Finally, the court need not consider the effect of various programs which allow the debtors to reamortize their loans over a longer term thereby significantly reducing their monthly payment. The evidence here shows that if the debtors reamortized their loans over a 20–year term, their payments would be $165.01 per month. Their disposable income of $142.19, however, is less than the required payment even under a 20–year repayment period.

### Conclusion

For these reasons the court finds that the debtors cannot repay their student loan debts to KHEAA without the imposition of an undue hardship upon themselves and their dependent child. Pursuant to Fed. R. Bankr.Proc. 9021, a separate judgment consistent with this memorandum opinion will enter declaring these debts dischargeable.

### FINAL JUDGMENT

In accordance with the Memorandum Opinion entered this day, it is hereby

ORDERED that the educational loan debts made the subject of the complaint and owed by John Frank McLaney and Robin P. McLaney to the Kentucky Higher Education Assistance Authority are not excepted from discharge under 11 U.S.C. § 523(a)(8), and those debts are hereby declared to be DISCHARGEABLE.